## Case No. 14,838.

UNITED STATES v. COLLYER et al.

[Whart. Hom. 483.]

Circuit Court., S. D. New York. 1855.

JURISDICTION OF FEDERAL COURTS—HUDSON RIVER.—REGULATION OF STEAM VESSELS—DESTRUCTION OF PASSENGERS — INDICTMENT FOR MISCONDUCT AND NEGLIGENCE—JOINT AND SEPARATE TRIALS.

[1. A violation of a law of the United States. committed on board a steamboat upon the Hudson river. within the ebb and flow of the tide. is within the jurisdiction of the federal court. although the place is within the body of a county of the state of New York.]

[2. An indictment based on section 12 of the act of July 7. 1838 (5 Stat. 304). against the officers and employés of a steamboat. is sufficient if it charges them, substantially in the language of the statute. with misconduct, negligence. or inattention to their respective duties. whereby the lives of passengers are destroyed. It is not necessary that the particular acts of misconduct. negligence. etc.. should be specifically set forth. or that the acts should be charged to have been committed feloniously.]

[3. In such an indictment. several defendants. occupying different stations of employment. such as the captain. engineer. pilot. etc.. may be joined, without showing that their acts were jointly destructive of the lives of those on board. or were joint in their commission.]

[4. If a number of persons jointly indicted be granted separate trials this does not entitle the first person tried to have the benefit of the testimony of the others: and hence the incompetency of such witnesses. in the case of a joint trial, is no ground for granting separate trials.]

[5. It is not necessary to a conviction under the statute to prove that there was willful or intentional mismanagement or misconduct on the part of the accused. It is not the intent which constitutes the essence of the offence. but it is. an improper act of the kind designated, and having the results named. though such act be unaccompanied with any evil intent.]

[6. It is not sufficient. under the statute. to show misconduct. negligence. or inattention on the part of the accused. and that. there was a burning of the vessel. which caused loss of life. but it must further be shown that such burning and loss of life were the direct consequences of the negligence or misconduct shown.]

[7. By "misconduct. negligence. or inattention" in the management of a steam vessel the statute means the omission or commission of any act which may naturally lead to the consequences made criminal; and it is immaterial what may be the degree of misconduct. whether slight or serious. if the proofs show that the destruction of the lives of persons on board was the necessary or most probable consequent of it.]

[8. To be a person "employed on board." within the meaning of the statute. it is not necessary that one should be employed under pay to perform any particular duty; but the statute applies to any one actually engaged in performing the duties of an officer or employé. as where: the captain being sick. another takes his place. and acts as captain. exercising the authority and control. and discharging the duties, of that officer.]

[9. If a captain has employed skillful and faithful subordinate officers and employés, then any act of misconduct, negligence, or inattention on their part, or the part of any one of them, is not imputable to him, and he cannot be held guilty under the statute, though such act directly results in destroying the lives of persons on board.]

The lamentable accident wherein the steamboat Henry Clay was destroyed on the banks of the Hudson river, and about eighty-five lives destroyed, is of too recent occurrence to need any particular recital of the same to bring it to the memory of our readers. This vessel started from Albany about 7 o'clock a. m. on the 28th July, 1852, with a large load of passengers and freight, bound for New York, to stop at most of the intermediate landings, and there to receive and land passengers and freight. The steamboat Armenia started from the same place, bound on a like voyage, with a smaller load of passengers, at about the same hour. It was alleged that shortly after starting from Albany, and somewhere in the neighbourhood of Hudson, which is thirty miles below Albany, and about one hundred and seventeen miles from New York, a contest of speed arose between the two boats, wherein the greatest exertion was made use of by the two boats to surpass each other in speed. The result of this contest was that at a point a little north of Kingston, the two boats came in collision, and it was alleged and believed by the public the Henry Clay endeavoured to crowd the Armenia on shore. This contest created excessive alarm on the part of the passengers, especially the females, on board of both boats. It continued until about Kingston, whereat the Armenia hove to for the alleged purpose of cooling her boilers and engine, which it was averred were overheated; but nevertheless, after a time the Armenia followed the Henry Clay, which latter proceeded on her course down the river, but with diminished speed, until her arrival in the vicinity of the Forrest House, two miles below Yonkers, and about fifteen miles from New York, when fire was discovered proceeding up from the fire room. Attempts were made to put it out, but without success, and finally the vessel was headed to the shore, and was beached, but unfortunately the progress of the fire was such that most of the passengers were prevented from reaching the shore, by the fire intercepting their passage through the gangways and over the promenade deck. They were gradually driven off the stern of the boat by the devouring flames, and all, or nearly all, who were at the stern perished. On the voyage down, it appeared that the captain was confined to his stateroom from sickness, occasionally giving an order. It was alleged that Collyer, who was principal owner of the boat, and who was on board, was in command, or had the principal charge and direction of the boat. The other officers were at their posts, and remained so until the vessel was beached, when they rushed in and endeavoured to save the lives of the passengers who were drowning. Many of them were saved by their exertions. It appeared, also, that before the boat reached the shore, numbers of the passengers plunged into the river, and the master of a boat who was near at hand went to their assistance, and saved a few. Many of them, however, were drowned.

Complaint was made in the public press, also, against the pilot of the boat, because of his beaching his boat at right angles to the shore, instead of in an oblique position. If the latter had been done, it was maintained that all might have escaped. Much indignation was expressed at an order which was said to have been given to the passengers by some one in authority, just before the vessel reached the shore, for them to go aft, which order was generally obeyed, and many of them who went aft were consequently destroyed. It was also charged that the vessel was insufficiently provided with boats, water buckets, life preservers, and pumps; that, if the vessel had been so furnished, all, or nearly all, would have escaped, or the flames would have been mastered. A coroner's inquest was held at Yonkers, a place about three miles from the place of the calamity, and was in permanent session for about ten days after the event, whereat evidence was taken of a very exciting and inflammatory nature. In New York, Dutchess, and West Chester counties, the grand juries of those counties were respectively charged by the judges of the supreme court, to take action in the premises. But the United States court first proceeded, and arrested the principal owner, Collyer, and the others above named, on the ———•day of August, 1852, and held them to bail in $10,000, to answer any indictment which might be found against them, under the section of the act of congress of 1838 [5 Stat. 304], which is as follows: "That every captain, engineer, pilot, or other person employed on board of any steamboat or vessel, propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court in the United States, shall be sentenced to confinement at hard labour for a period not more than ten years." After their arrest at the instance of the United States courts, and bailing out, as above stated, the West Chester authorities, on the finding of the coroner's inquest, preferred a complaint against them for murder, under the following section of the New York Revised Statutes, viz: 2 Rev. St. (4th Ed.) p. 843, § 5. Such killing, unless it be manslaughter, or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases: (1) When perpetrated from a premeditated design to effect the death of the person killed, or of any human

being. (2) When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. (3) When perpetrated without any design to effect death, by a person engaged in the commission of any felony.

The defendants were arrested and held in custody by the sheriff of West Chester county, but, before they could be removed to West Chester county, a writ of habeas corpus was sued out at the instance and on the petition of Dennis McMahon, Jr., who appeared as counsel for all except Collyer.

This habeas corpus was argued and discussed before his honour, Mr. Justice Edmonds, in the month of September, 1852, by Mr. McMahon, for all the defendants excepting Collyer, by Mr. Cutting and Mr. O'Conner, for defendant Collyer, and by District Attorney Wells, of West Chester county, and Mr. Lockwood, for the state authorities.

The argument and decision are reported. People v. Sheriff [1 Parker, 659]. The learned judge overruled the charge of murder, but held them to answer on the charge of manslaughter in the first degree, and held them in bail in $10,000. Shortly after this decision, the grand jury summoned to the United States district court in New York found an indictment for manslaughter against all the defendants, under the aforesaid section of the act of 1838. After the finding of this indictment, an oyer and terminer was subsequently held in West Chester county by the state court, and an indictment was there found against all the defendants for manslaughter in the first degree. To this indictment the defendants Tallman, Germaine, Hubbard, Jessup, Elmendorf, and Merrit, pleaded to the jurisdiction. To that plea the district attorney demurred. The other defendant, Collyer, pleaded not guilty. The demurrer to the plea of jurisdiction was never brought on for argument; the state authorities concluding to await the issue of the trial on the United States indictments.

The plea was as follows:

"In the Court of Oyer and Terminer held in, and for the County of West Chester. The People, &c., v. John F. Tallman, James L. Jessup, John Germaine, Charles Merrit, Edward J. Hubbard, James Elmendorf, imp'd with Thomas Collyer. And the said defendants, impleaded as aforesaid, come into this court of oyer and terminer, held in and for the county of West Chester, and having heard the indictment now here read, say that the said court of oyer and terminer ought not to have or take cognizance of the said offences in the said indictment against them preferred, because, protesting that they are not guilty of any of the said offences, they say that the same were committed on the waters of the Hudson river, near Yonkers, and within the county of West Chester, within the ebb and flow of the tide. And they aver that at the

several times when the said supposed offences set forth in the several counts in the said indictment were, as therein alleged, committed, the said John F. Tallman was captain or master of the steamboat or vessel hereinafter named, and the said John Germaine was engineer thereof, and the said Edward Hubbard was pilot thereof, and the said James L. Jessup, Charles Merrit, and James Elmendorf were persons respectively employed on board thereof. And the said steamboat Henry Clay was at the several times when the said supposed offences, set forth in the several accounts of the said indictment, were as therein alleged committed, a vessel propelled in whole or in part by steam, duly enrolled and licensed under the enrolment and navigation laws of the United States of America, and engaged in the navigation of the navigable tide waters of the Hudson river, between the cities of Albany and New York, stopping at the intermediate places, on said river, at and above Sing Sing. And the said several persons mentioned in the several counts of the indictment now here, whose lives, as therein alleged, were destroyed, were persons respectively on board of said vessel at the time of the commission of the said supposed offences. And they aver that the said supposed offences were committed after the 7th day of July, A. D. 1838, to wit at the several times in the several counts of the said indictment declared. Wherefore they say that the circuit court of the United States, within and for the Southern district of New York, had at the several times when the said supposed offences set forth in the said several counts of the said indictment were as therein alleged committed, and have now, the sole and exclusive right to entertain cognizance of, and jurisdiction over, the offences in the said indictment described and set forth, and this they are ready to verify. Wherefore they pray judgment whether the said oyer and terminer ought and will further proceed against them. D. McMahon, Jr., attorney for defendants Tallman, Jessup, Hubbard, Germaine, Elmendorf, and Merrit."

"State of New York, City and County of New York.—John F. Tallman, James L. Jessup, Edward Hubbard, John Germaine, James Elmendorf, Charles Merrit, being duly sworn, say that the aforesaid plea is true in substance and matter of fact.

"Sworn to before me this 25th day of November, 1852. John Germaine. Allen Hand hurst, Justice of the Peace.

"Sworn to before me this ―――― day of December, 1852, by Benedict Levis, Jr., Commissioner of Deeds. John F. Tallman."

In January, 1853, the defendants Tallman, Germaine, Hubbard, Elmendorf, Jessup, and Merrit were called upon to plead to the United States indictment, when their counsel made a motion to quash the indictment, on the following grounds, namely: (1) That the indictment was defective in form. (2) That the first, second, third, fourth, fifth, sixth, seventh, thirteenth, fourteenth, and fifteenth

counts were defective in form. (3) That the different counts of said indictment charge the offence in the words of the statute, without setting forth with sufficient minuteness the offence and the circumstances constituting the same. (4) That it does not charge the offence as having been committed knowingly or feloniously, or with intent to injure any person on board the vessel. (5) All the counts want the fulness and precision required by law in describing a criminal offence; and connecting any person with it. (6) It does not describe any of the defendants as having been engaged in the actual navigation of the vessel at the time the lives were lost; nor does it describe that their duties were such as that a neglect thereof or inattention destroyed the lives. It indicts jointly for the same offence, in the same count, several different defendants, occupying different stations of employment on the boat, for a negligence or inattention to, and a misconduct in executing, their respective duties, without showing how, or in what manner, their different acts were joint in bringing about directly the destruction of the lives alleged to be lost.

The following is a synopsis of the indictment in question: First count. That Collyer, Tallman, Germaine, Hubbard, Jessup, Elmendorf, and Merrit, on the 28th day of July, 1852, on the navigable waters of the United States, and within the ebb and flow of the tide on the Hudson river, &c., were persons employed on board of the Henry Clay, propelled by steam, which vessel was then owned by persons, citizens of the United States, unknown, and did then and there, by their misconduct, negligence, and inattention to their several and respective duties, in their several and respective employments on board of said steamboat, cause the lives of Stephen Allen. Abraham Crist. A. S. Downing, Geo. F. Whittock, Julia Hoey, and divers other persons then being on board, to be destroyed. Second count. That the same persons, on the 28th July, 1852, on the Hudson river, &c., were persons employed on board the steamboat Henry Clay, which was then owned by William Radford, Thomas Collyer, and John F. Tallman; and did then and there, by their misconduct in their several and respective employments on board of said vessel, cause the lives of Stephen Allen, &c., and others unknown, on board of said steamboat Henry Clay, to be destroyed. Third count. Same as second count, except it uses the word "negligence" instead of "misconduct." Fourth count. Same as third count, except it uses the words of the statute, viz. "inattention to their several and respective duties in their several and respective employments." Fifth count. That said persons. &c., on the 28th July, 1852, in the navigable waters of the United States, and within the ebb and flow of the tide, that is to say, on the Hudson river, in the Southern district of New York, were persons employed on board of a steam-

boat propelled in whole by steam, called the Henry Clay; that is to say, Thomas Collyer, as part owner, and acting for the captain in command of the boat, Tallman, as captain, Germaine, as engineer, Hubbard, as first pilot, Jessup, as clerk, Elmendorf, as second pilot, Merrit, as assistant engineer, of said boat, which was then and there owned by Thomas Collyer, William Radford, and John F. Tallman, citizens of the United States, and did then and there, by the misconduct of the said persons in their several and respective duties, in their before mentioned and described employments, on board of said steamboat Henry Clay, cause the lives of Stephen Allen, Abraham Crist, and divers other persons unknown, on board thereof, to be destroyed. Sixth count. Same as fifth count, except it uses the word "negligence." Seventh count. Same as fifth count, except it uses the words of the statute thus: "By the inattention of them, &c., to their special and respective duties, in their before mentioned and described employments," &c. Eighth count. That said persons, on the 28th July, 1852, on the river Hudson, commonly called the "North River," within the ebb and flow of the tide, and within the Southern district of New York, &c., being then and there persons employed in the following capacities; that is to say, Collyer, as part owner, in command, the said John F. Tallman, as captain, the said John Germaine, as engineer, the said Hubbard, as first pilot, Jessup, as clerk, Elmendorf, as second pilot, Charles Merrit, as assistant engineer, on board of a steamboat propelled in whole by steam, called the Henry Clay, not regarding their several and respective duties, in their aforesaid respective capacities, did then and there, by inattention to their said duties, so negligently navigate, control, and steer the said steamboat, called the Henry Clay, as to cause one Julia Hoey, then and there, being a passenger on board said steamboat Henry Clay, to be overwhelmed by the waters of the said river Hudson, and in and by said waters she was drowned, and did die; and so the jurors say that the said Thomas Collyer, John F. Tallman, &c., the life of the said Julia Hoey by their negligence and their inattention to their said several duties feloniously did destroy, &c. Ninth count. Same as eighth count, except it charges "so inattentively navigate and manage the said steamboat Henry Clay, and manage and regulate the steam and furnace on board said steamboat, as to cause the said steamboat to take fire; by means whereof Stephen Allen and Abraham Crist, and divers other persons, were overwhelmed," &c.; and charges that the lives of said Allen, &c., were destroyed by the inattention of the defendants to their several duties, as aforesaid. Tenth count. Same as last count, excepting it calls Collyer "acting captain." It uses the words "misconduct and negligence, and by inatten-

tion to their respective duties, and so inattentively manage, regulate, and conduct the fires and steam on board said Henry Clay, as to cause her to catch fire, whereby they were cast and thrown from, and out of, the steamboat, into the water of the Hudson river; and that by their misconduct and negligence, and inattention to their respective duties, the lives of the said persons were destroyed." Eleventh count. Same as tenth count, except it uses the words "feloniously disregarding their respective employments; did so negligently and inattentively navigate, control, and manage the steamboat Henry Clay, and so negligently and inattentively manage and regulate the fires and steam, &c.," which said steamboat was then and there under the guidance and control of the said defendants, that by their misconduct and negligence the said lives were destroyed. Twelfth count. Same as eleventh count, except it uses the words "by misconduct and negligence, and by inattention to their respective duties, as aforesaid, so inattentively manage, navigate, and control the said steamboat Henry Clay; and so inattentively manage, regulate, and control the fires and steam on board said steamboat Henry Clay, as to cause said steamboat to take fire, by means whereof one Inock Simons, then and there being on board, was burned, and from such burning died; and charges his destruction to their misconduct and negligence, and inattention to their respective duties." Thirteenth count. Same as second count, except it charges the life of Inock Simons to be destroyed. Fourteenth count. Same as last count, except using the word "negligence" instead of "misconduct." Fifteenth count. Same substantially as fifth count, excepting it charges the death of Inock Simons, having been caused by fire, by reason of their inattention to their respective duties.

Argument was heard at great length on this question before his honour. Mr. District Judge BETTS, and a similar case, that of The Reindeer, was heard at the same time. In the latter case the defendants had pleaded to the indictment, but having faith in Mr. McMahon's motion, united with him in it on the part of their clients.

The following are the arguments of the defence and of the United States on that motion.

Mr. McMahon, for the six defendants above named, argued:

1. The circuit court of the United States of America has no jurisdiction of the offences described in the indictment, because: (1) It describes the offence as having been committed on the Hudson river. The court can take judicial notice that the Hudson river ends at New York Bay. All above New York Bay is entirely within the limits of the state of New York. Peyton v. Howard, 7 Pet. [32 U. S.] 322. (2) In U. S. v. Bevans, 3 Wheat. [16 U. S.] 336, it was decided that the courts of the United States have not jurisdiction of offences under the admiralty until congress have legislated on the subject. (3) Congress have no right to legislate respecting offences committed on navigable waters entirely within the limits of a state; and the Hudson river is a navigable stream entirely within the limits of the state of New York. The jurisdiction of the state of New York extends to low-water mark on the Jersey shore. Com. v. Peters, 12 Metc. [Mass.] 387; [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 443. (4) The act of 1838 does not, in terms, extend the jurisdiction of the United States courts to the navigable waters wholly within a state. It merely authorizes the general admiralty jurisdiction to apply, to take cognizance of what it describes to be an offence, and the general admiralty jurisdiction does not apply to waters within the body of a county, or fauces terrae. U. S. v. Wildbore. 5 Wheat. [18 U. S.] 76, 103, 104; S. C. Crimes Act. March 3, 1825 [4 Stat. 115], April 30, 1790, § 12 [1 Stat. 115]; United States v. Grush [Case No. 15,268]. (5) The court should be extremely chary of extending the act to apply to offences committed on the Hudson river, because, if the admiralty has jurisdiction, it is exclusive, and is a serious attack upon the rights of state sovereignty. This point is pressed in sober earnestness, as it happens that both the state, county, and the United States courts have here assumed jurisdiction, and intend to exercise it.

2. This indictment is defective in form, and describes no offence whatever: (1) It follows the words of the statute of 1838, in describing the offence, without stating in what way the defendants were guilty of misconduct, negligence, or inattention to his or their respective duties, or what were the respective acts of misconduct, negligence, or inattention constituting the offence. In any event, the first, second, third, fourth, fifth, sixth, seventh, thirteenth, fourteenth, and fifteenth counts are bad for that reason. (2) The offence being a felony, such a particularity is required, both at common law, and by the decisions of our courts. 1 Chit. Cr. Law, § 22; Archb. Cr. Pl. 50, 64: Starkie. Cr. Pl. 235; Reg. v. Barrett. 2 Car. & K. 343; Car. & P. 156; U. S. v. Mills, 7 Pet. [32 U. S.] 142; State v. Raines, 3 McCord, 533; Hampton's Case, 3 Grat. 590; Com. v. Stout. 7 B. Mon. 247: People v. Allen. 5 Denio, 76. (3) As the terms "misconduct, negligence or inattention" are very broad and indefinite, by the use of them alone no indication is given to the defendants of what they are guilty, and to meet such a charge they must be in great danger of conviction, because of their not knowing what description of misconduct, negligence, or inattention, they are to combat. Reg. v. Barrett. 2 Car. & K. 343; State v. Fields, Mart. & Y. 137. (4) The offence is not set forth as having been committed feloniously, or with intent to injure any person or persons on board said vessel. Archb. Cr. Pl. 64. (5) It sets forth that the misconduct, negligence, or in-

attention to their respective duties, &c., caused the lives of, &c., to be destroyed, without showing that such acts directly destroyed the said lives; and, under the principle of causa proxima non remota spectatur, the indictment shows no offence under that statute. Howel v. Com., 5 Grat. 664; Anthony v. State, 13 Smedes & M. 263.

3. The indictment is defective in substance because: (1) It indicts jointly, for the same joint offense, in the same count, several defendants occupying different stations of employment on the steamboat, for a joint misconduct, negligence, or inattention to their respective duties, without showing that their acts were jointly destructive of the lives of those on board, or became or were joint in their commission. (2) The statute of 1838, under which this indictment is framed, does not contemplate a joint negligence, because the phrases of the act are disjunctive or distributive, thus, every captain, &c., by whose misconduct, negligence, or inattention, respecting duties, &c. (3) The words "misconduct, negligence, or inattention" mean omission or ill conduct that is passive; action is not implied. The terms amount to an absence of will in what they do or omit to do, because, if there is will, then malice would be inferred, and they would be guilty of murder. If no will, then there is inertness of the mind; which in each one is separate, because the inertness of the mind of the captain is different from the inertness of the engineer, their duties being distinct, and the exemplification of that inertness being different. The captain's misconduct, negligence, or inattention has reference only to his respective duty as captain. So with the engineer, so with the pilot, and so with the others. Each is guilty in his respective sphere. Their guilt is different, and the manifestations of that guilt are different, and in no sense are their acts, or causes conducing to those acts, joint. Where several commit a joint act, not of itself illegal, but which becomes so by reason of some circumstance applicable to each individual severally, and not jointly, they must be indicted separately. 2 Hawk. P. C. c. 25, § 89; Barb. Cr. Law, p. 338. Thus several partners cannot be indicted jointly for exercising their trade without having served an apprenticeship. 1 Salk. 382; 1 Strange, 623; 2 Strange, 921; Barb. Cr. Law, 338; 1 Burrows, 2, 4. 6. When several persons are engaged in publishing a libel, and the publication of each be separate, they must be severally indicted. Barb. Cr. Law, 338. So, on a joint charge for receiving stolen goods, a joint act of receiving must be proved. Proof that one received in the absence of the other, and afterwards delivered to him, will not suffice. Rex v. Messingham, 1 Moody. Crown Cas. 257. See Russ. & R. 344. See Vaughan v. State, 4 Mo. 530; Weinzorpflin v. State, 7 Blackf. 186. The motion to quash is the proper way to moot these points, for, if the matters alleged in the indictment are not punishable by law, the indictment will be quashed. Whart. Cr. Law, 131; Archb. Cr. Law, 64. So the court may quash, in its discretion, for such insufficiency as will make any judgment erroneous, given upon any part of it against the defendant. Betts, District Judge, in U. S. v. O'Sullivan [Case No. 15,974], citing authorities; U. S. v. Goodwin, 12 Wheat. [25 U. S.] 460.

The United States district attorney, J. Prescott Hall, in rising to oppose the motion to quash the indictment in this case, said that he should not consider it any part of his duty to occupy much of the time of the court in discussing the exceptions taken to the indictment, because he knew his honour was familiar with the law and the principles laid down in several discussions in similar cases. Knowing the judge's general preparation in all matters, he would merely state, first, in answer to the objections as to jurisdiction, that the law was sufficiently explicit in bringing this offence within the terms of the act of congress, and that the objection was at an end, provided there is nothing in the law inconsistent with the constitution of the United States. The learned counsel then referred to the act providing for the better security of the lives of passengers on vessels which are propelled in whole or in part by steam. The twelfth section provides, that every captain, engineer, pilot, or other person employed on board any steamboat, by whose misconduct, negligence, or inattention life is destroyed, shall be deemed guilty of manslaughter. Yet it may be that congress had no right to pass the law. If so, there would be an end to the question; but he (the district attorney) took it for granted, that no court, at nisi prius, would take upon itself to assume that congress had violated the constitution of the United States, unless it clearly appear that it had done so. It would be enough for him (Mr. Hall) to show that congress have that authority, not only by the words of the constitution, but by express adjudications of the supreme court. It does not follow, as a logical deduction, that, because the states have jurisdiction over certain crimes, congress therefore has not. It does not follow that, because congress has jurisdiction over certain crimes, the states have not. The district attorney then referred to the case of Fox [v. Ohio], charged with counterfeiting, reported in 5 How. [46 U. S.] 434, and remarked that his honour, Judge Betts, had given the same construction to the act concerning the counterfeiting of coins which had been put upon it by the supreme court of the United States, in Marigold's Case, 9 How. [50 U. S.] 560. Even before that case was decided, the supreme court held, in those cases, that, although the states might have jurisdiction over certain crimes, yet, that congress might also exercise the same power in cases within their jurisdiction. In relation to the matter now before the court,

he submitted that it was not important whether it was exclusively under the authority of congress or not. It is part of that jurisdiction in which is included the power to regulate commerce, and that, also, includes the power to regulate navigation. If congress had the power to regulate navigation, they have the right to regulate it everywhere. The power extends to the land, as well as the sea. As to the point about the flow and ebb of the tide, that has been long since exploded. He referred to the case of the Ohio bridge, in which it had been decided that the admiralty power extends to the lakes, and the power of congress extends to the land, as well as to the sea, in matters of commerce. It is a question of power, not of discretion. If congress have a right to regulate navigation, there is no limit upon their discretion. It is for congress to say how, and in what manner, the regulation shall be made and exercised. But this is not a matter open for construction. The supreme court has expressed its opinion upon this very act, and has decided that it is applicable to all steam vessels, whether navigating the rivers, the ocean, or the lakes; and that its commands must be obeyed ·by all persons within its description and enumeration. The district attorney here cited and commented at great length upon the following cases, which he insisted had set the matter of jurisdiction at rest. New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. [47 U. S.] 394; U. S. v. Coombes, 12 Pet. [37 U. S.] 72; Waring v. Clark, 5 How. [46 U. S.] 461–465. In this last case, the supreme court say that the act of July, 1838, in all its provisions, is obligatory upon the owners and masters of steamers navigating the waters of the United States, whether navigating on waters within a state or between states. Then, as to the forms of the indictments, the district attorney insisted that they were sufficient in all particulars, and conformable, not only to precedents, but to express adjudications. In setting forth a crime created by statute, it is sufficient to describe the offence in the words of the statute itself, and this rule has been followed in some of these counts, while in others, the particular mode in which the terrible calamity overwhelmed men, women, and children in one common ruin are particularly set forth. In some counts, death is attributable to the direct action of fire and steam; in others, water, in which the sufferers sought refuge to escape the still more dreadful ravages of flame. The district attorney then commented upon the objection made that there could be no such thing as joint negligence, and insisted upon it that, in practice, such inattention might exist, as in cases where two men are stationed at one point to keep common watch, and both neglect their common duty by gross acts of negligence. But in this case joint misconduct is charged, and in the Henry Clay's Case the indictment sets forth that he, Collyer, the owner, was acting as master; that the captain was also acting in conjunction, not only with him, but with the engineer, pilot, clerk, and others of the crew; that all these were acting together, each in his own department, the object being to surpass the Armenia in speed; that each and all were reckless; and that the consequence of this recklessness was the burning of the boat, and the destruction of her passengers. He insisted, therefore, that, both in theory and in practice, the indictments were good, and ought to be sustained, and he cited and commented upon many cases in support of his positions. The argument of the district attorney occupied upwards of two hours.

Mr. McMahon replied on the part of his clients. In the course of his argument, the judge interrupted him, saying that he would not take into consideration the question whether the law was unconstitutional. The only question he would entertain was whether this court had jurisdiction in the matter.

Mr. McMahon then continued his argument, and was followed by Mr. Noyes, on behalf of the parties implicated in the Reindeer catastrophe. The court then adjourned, the judge reserving his decision until morning.

THE COURT, after advisement, delivered an oral opinion, in which he considered at some length the objections, but finally overruled them, and ordered the defendants to plead to the indictment. The defendants all plead not guilty.

D. McMahon, for defendants Tallman, Jessup, Elmendorf, and Merrit.

Henry G. Wheaton, for Germaine.

George N. Betts and Ambrose L. Jordan, for Collyer.

J. Prescott Hall, late Dist. Atty., and Mr. Dunning, for the United States.

The prosecution moved on the trial of the defendants together. The counsel for the defence, on affidavits, asked for separate trials, principally because the defence of the defendants were antagonistic to each other, and that no fair trial could be had of all the defendants together, and that the evidence of the defendants was reserved for each other. This separate trial was opposed at much length by the prosecution.

After a long discussion, INGERSOLL, District Judge, decided against the separate trial, remarking as follows, viz.: "It appears to me that a great many topics have been discussed here which it is unnecessary to consider in disposing of this motion. They will properly be considered when the case goes to the jury; and as to what weight will then be given to them, under the instruction of the court, I do not think it necessary to intimate an opinion. The act of congress provides: 'That every captain, engineer, pilot, or other person employed on board any steamboat or vessel, propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his or their respec-

tive duties, the life of any person or persons may be destroyed, shall be deemed guilty of manslaughter.' Now, the indictment at present under consideration is founded upon this act of congress, and it charges the individuals named in it with this misconduct and negligence. It charges them with a joint misconduct, and that by such misconduct and negligence they are all liable. It is not necessary for me to determine any questions which may have been had up before Judge BETTS heretofore, or to intimate what I think of his opinions; but, undoubtedly, I should have concurred in his opinion, after due consideration had by me. The question now is, whether the court will order a separate trial to Mr. Collyer, before the other defendants are tried. because it is evident that the object is to have Mr. Collyer tried first."

Mr. Jordan: "So far as we are concerned, we never asked anything of the sort, nor do we wish it."

INGERSOLL, District Judge: "It makes no difference whatever. The object is to have one tried before the other, and why? The reason is, and there can be no other legitimate reason, that unless there is a separate trial, there cannot be a fair trial; and then the question comes up, that being the reason, has there anything transpired by which it is made to appear that these parties cannot have a fair trial if they are tried jointly? And, if there is no reason made to appear that they cannot have such a fair trial, then it is the duty of the court not to order a trial separately. But if it is made to appear that they cannot be fairly tried jointly, then, as I conceive, it is the duty of the court, although it has often been said to be in their discretion, to order a trial separately. What are the reasons which are urged to induce me to believe that the defendants cannot be tried jointly? They are two. The first is that the defence of some of these defendants is so antagonistic to each other that they cannot have a fair trial; and. secondly, that they cannot be tried fairly without having the testimony of their codefendants in their behalf, as I understand it. and that, therefore, they should be ordered to be tried separately, so that they could have the testimony of their codefendants adduced in their behalf.

"One word as to this latter reason before I consider the first. Is there any ground, for that reason, that I should order a separate trial to be had in this case? Whether Mr. Collyer were tried first, or the captain, or the engineer, it is said that the one who is thus tried first ought to have the benefit of the testimony of the other, and could not have it, and it follows that it should be granted for that reason; and the question is, could he do it? This question has been often before the courts, not only in the states, but before the courts of the United States. It has been before the supreme court, in a case reported in Johnson, in a case in Massachusetts, of Pick-

ering, where a separate trial was ordered, and where the party who was first tried offered the testimony of his codefendants, and it was refused, because the codefendant was not a witness. Two years ago the same subject was had up before the supreme court of the United States. It was a case that went up from Virginia, where two individuals were indicted for murder upon the high seas, and where a separate trial was ordered, and where the one first tried offered the testimony of the other one who was indicted, and not upon trial, and the question went up to the supreme court whether he was a competent witness for the one first tried, and the supreme court decided that he was not; although in the state of Virginia a law had been passed, prior to the time that the trial was had in the circuit court, that where a separate trial was had, the one first tried might have the benefit of the testimony of the other. The supreme court decided, although it was so in the State of Virginia, yet in the courts of the United States the one first tried could not have the benefit of the testimony of the other who was indicted with him, and therefore this reason which has been urged is not well sustained; for if this defendant was tried separately, the object would not be obtained, for he could no more have the testimony of those indicted with him upon that trial, than he could have upon a joint trial.

"Now, as to the other reason. Is the defence so antagonistic that the defendants cannot be fairly tried? I certainly do not think so. If I did, I should be inclined to grant a separate trial. It is not that any one who is acting as captain, or mate, or engineer, and him only, shall be liable under the statute, but it is any person; and in reference to the ground urged by the last counsel. that it is necessary for him to implicate the witnesses, in order to excuse the captain, whom he represents, I do not understand it so at all. if what he says is true, that the captain was sick, so that he was not able to attend to his duties on board the vessel, and did not so attend to them, and the command devolved upon the next officer. If he was sick, and could not attend to his duties, he has done nothing. If that is made to appear, then, as I view the case, unless there is something more in it, and this misconduct happened during his sickness, and he could not attend to it, then, in my judgment, he will be free, because he will not be implicated in that misconduct. His sickness would excuse him. I do not therefore see any reason, upon each of the grounds to which I have alluded, that the defence of the defendants is so antagonistic that they cannot have a fair trial if tried together."

Mr. Dunning, the associate district attorney, opened the case for the prosecution. He said: "The defendants have been indicted under the provisions of the twelfth section of the act of congress, approved July 7, 1838, entitled. 'An act to provide for the better security of the lives of passengers on board of

vessels propelled in whole or in part by steam.' That section says, 'And be it further enacted, that every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, negligence or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof before any circuit court in the United States, shall be sentenced to confinement at hard labour for a period of not more than ten years.' The indictment in this case contains various counts, and in substance charges that the defendants, on the 28th day of July, 1852, were the persons having charge of, and employed on board the steamboat Henry Clay, a vessel propelled by steam; that John F. Tallman was the captain, John Germaine, engineer, Edward Hubbard, pilot, James L. Jessup, clerk, James Elmendorf, second pilot, and Thomas Collyer acting as captain; that by their misconduct, negligence, and inattention to their respective duties, the lives of Stephen Allen, A. J. Downing, Abraham Crist, and divers other persons, were destroyed. It will appear that on the morning of the 28th July, 1852, the Henry Clay left Albany, freighted with human beings, having more than four hundred passengers on board, bound for this city. While on her passage down the river, at about three o'clock in the afternoon, when nearly opposite Yonkers, she was discovered to be on fire, and so rapidly did the flames spread that they soon gained the mastery, and it was found to be impossible to extinguish them. The boat at this time was near the middle of the river, but was soon headed for the shore, which she succeeded in reaching, her bow being run aground, her stern remaining in deep water. Then ensued a scene of horror that baffles all description. At the time the vessel reached the shore, most of the passengers were on the after part of the boat, having been directed to go there by those in command. The wind was blowing from the shore, and the fire, which originated near the middle of the boat, was raging to such an extent as to render it almost impossible to pass it. In their attempts to reach the shore, more than eighty of the passengers on board, with scarce a moment's warning, were hurried into eternity. The fearful alternative of perishing by the flames or the waves was presented to many of the unfortunate passengers of that ill-fated vessel; and each element, the fire and the water, received its share of victims. No age, sex, or condition in life escaped. The mother and her infant, the old and the young, the man of four score years and the youth, shared a common fate. For a time the sad tidings of this catastrophe spread a gloom over the land, and well they might, for they brought sorrow and anguish to many a heart, and desolation to many a home. It is charged

that this sacrifice of human life was caused by the negligence, carelessness, and inattention of the defendants, and it will be for you to say whether this charge is well founded. Your position therefore, gentlemen of the jury, is an important and a responsible one,—important for the defendants; important for the community. You stand between the living and the dead; for, although your verdict cannot reanimate the dead, it may save the living, may prevent the occurrence of similar calamities, may teach a lesson to those who have the charge and management of steamboats, much needed to be taught, that the safety and lives of passengers committed to their charge are not to be trifled with or taken with impunity. The frequency of occurrences of this character may well excite alarm. Scarcely a day passes but we receive intelligence through the public prints that life has been destroyed by the recklessness—the criminal recklessness—of those having charge of our railroad locomotives and steamboats. And where shall we look for a corrective, if not to a jury, when a proper case is presented for their consideration? Let the law be rigidly enforced, and such occurrences will cease. Let courts and jurors, ministers of justice, falter in the proper discharge of their respective duties, and such occurrences will be more frequent still.

"I have said thus much, gentlemen, to show you the importance of the position you occupy. I ask you to weigh the evidence for the prosecution calmly and dispassionately, and render such a verdict as will satisfy your minds, under the circumstances. I shall not attempt any minute statement of the evidence that will be introduced. I prefer that you should listen to the statements of the witnesses, and take the evidence as it shall fall from their lips, rather than any statements or conclusions of my own. We shall produce as witnesses many passengers who were on board, and saw the whole occurrence. We insist, and I think it will appear from the evidence, that on the 28th July, 1852, the day on which this awful calamity occurred, the Henry Clay was engaged in a fearful race—a trial of speed—with the Armenia, and that from that cause the catastrophe resulted. The vessels left Albany at nearly the same time; the Henry Clay being a few minutes in advance of the Armenia. That there was a race, we shall call a variety of testimony to prove. The witnesses will detail the occurrences that took place on that passage; and that the race for supremacy was contemplated before the vessels left Albany will also be apparent. So evident was it to the passengers on board that the boats were racing, and so much were their fears excited, that they remonstrated with the officers and Mr. Collyer; the captain being sick, and not on deck; they besought them to desist; but in vain. Their remonstrances were unheeded, and the race continued.

Many of the passengers who had paid their passage to this city landed at Poughkeepsie, and other points of stopping, being fearful to proceed further in the boat, and pursued their journey by other conveyances. This apprehension of the passengers, this desertion of the boat, would scarcely have occurred unless they were satisfied that there was a race. We shall show, also, that the boat that day did not make all her usual landings. They were so anxious to succeed in the race, that they passed the landings, to which some of the passengers had paid. The vessels were in such close proximity that at one time the Henry Clay ran into the Armenia. One of the firemen who went up to Albany on the Henry Clay on the 27th, refused to return on the 28th, fearful of the occurrence of some such calamity as actually happened. That the boats were engaged in a fearful contest for supremacy will, I think, abundantly appear from the evidence; and that each and all of the defendants contributed their efforts to enable the Henry Clay to succeed, will also be fully established."

Mr. Dunning then proceeded to state the other facts that he would adduce in evidence for the prosecution; that the race was continued notwithstanding the remonstrances of the passengers; that the vessel was certified to carry thirty pounds of steam to the square inch, and that she had much more; that the vessel was not provided with the necessary means of escape,—with life boats, life preservers, or the usual number of buckets, in case of fire; that each of these was deficient in number, and that the catastrophe resulted from a want of care in this respect; that the vessel was on fire the day before this catastrophe; that she was on fire at an earlier period on the same day; and that she had been frequently on fire before the 28th July,—and these facts, though not bearing on this case, go far to show a criminal negligence. They were notified, not only at an earlier hour on the same day, but they had been frequently notified previously. The passengers would tell the jury of these facts, and that some of them counted the number of revolutions the vessel made, though they may not be able to tell the exact speed she was going at. That, however, is not material. It will be for the jury to determine whether the defendants caused this destruction of lives. They would perceive that, by the statute, while the punishment may be ten years' imprisonment, it is within the discretion of the court to reduce it to one day. It was not necessary for the prosecution to show that the defendants, or any one of them, intended this calamity. It was enough for them to show that it was the result of misconduct, carelessness, or negligence. The learned gentleman then referred to the able and elaborate charge of his honour, Judge Betts, in the case of U. S. v. Farnham [Case No. 15,071], in which he says: "The indictment charges on the master of the Reindeer the crime of manslaughter, because, by

his misconduct, negligence, or inattention at the time and place alleged, the lives of many persons were destroyed. The question at issue, on this indictment, is whether the government have, by legal and sufficient proof, convicted the defendant of the crime of manslaughter. In the first place, the law does not require the public prosecutor to prove willful mismanagement or malconduct by the accused. You are not to inquire if he was guilty of intentional negligence or inattention, but only if he did what is forbidden by the law. The point of inquiry before you is whether he was guilty of misconduct, negligence, or inattention, and whether the explosion and destruction of life arose from either of those causes. In order to determine that, we must have a clear and accurate understanding of the meaning of the terms used by congress in this law. By misconduct, negligence, or inattention in the management of steamboats is undoubtedly meant the omission or commission of any act which may naturally lead to the consequences made criminal; and it is no matter what may be the degree of misconduct,—whether it is slight or gross,—if the proofs satisfy you that an explosion of the boiler was the necessary or most probable result of it."

Mr. Dunning concluded his address, which was listened to with marked attention by a crowded court, by saying that "it was neither the duty nor the inclination of the prosecution to urge the conviction of the defendants, unless the evidence we shall be able to introduce shall satisfy your minds of their guilt. We are not here to urge the conviction of the innocent. The law neither needs nor seeks such victims. It will be our purpose to introduce such evidence as is under our control and which, in our judgment, clearly tends to establish the guilt of the defendants. We shall strive to state the case fairly between the government and the accused, and, having done so, we shall have discharged our duty, and it will then be for you, gentlemen, to discharge yours."

Much evidence was given in on the part of the United States (the trial occupying fourteen days) to support the propositions of fact in their opening. The facts appeared in proof pretty much according to the previous statement, excepting that witnesses of the prosecution were principally unacquainted with steamboats and their management, and two or three whom they called, who were experts in navigation, approved of the conduct of the pilot of the vessel in putting her ashore.

The defence was opened by Mr. McMahon, who said:

"Before opening the case, I beg leave to submit to your honour one or two authorities and one or two propositions of law, in answer to the cases which have been cited very frequently by the prosecution.

"The first proposition is, 'that, under the act of congress of the 7th July, 1838, it must

appear that the deaths or the homicides must result directly and proximately from the misconduct, the negligence, or inattention complained of.' In support of that proposition, I refer to the 12th section of the act, that 'every captain, engineer, pilot, or other person employed on board of any steamboat, or vessel propelled in whole, or in any part by steam, by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person, or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter, and upon conviction thereof, before any circuit court of the United States, shall be sentenced to confinement at hard labour for a period not more than ten years.' The act declares that the death must be caused directly and proximately by misconduct and inattention to their respective duties.

"The second proposition is that mere negligence or misconduct, or mere inattention, although it be sufficient to charge the officers in a civil suit for damages, does not subject the defendants to this indictment, and that an error in judgment, such as putting this boat on shore, or in the confusion that ensued on that day, when the fire was discovered, in ordering the passengers aft, does not constitute the misconduct, &c., as used in the 12th section. It must be such negligence, or such misconduct, or such inattention, as would, when committed, be likely, in itself, directly to cause the homicide; thus, in a case of bursting boilers; for the engineers to put extra weight on the safety valves, or for the captain to engage in a race with a rival boat, and in such race his boilers would collapse from the extra strain put upon them; and the act of omission must be such as that its performance or nonperformance would be a notice to the officer doing, or omitting to do, the act, that he was guilty of criminal dereliction of duty. Rex v. Allen, 7 Car. & P. 153; Rex v. Green, Id. 156.

"The third proposition is nearly involved in the second; that the negligence, misconduct, or inattention must not be merely omissive, but it must be such gross negligence as is akin to fraud, under the law of bailments, or, as Judge Betts expresses it, 'intentional negligence.' 3 East, P. C. 265.

"My fourth proposition is that, under this indictment, it is necessary to show that each of the defendants, in the performance or nonperformance of his respective duty, was guilty of such misconduct, neglect, or inattention as that thereby they all directly caused the injury complained of, and that their acts converged to, and had in view, some great personal injury to the passengers. Now, with regard to the inferior officers of that vessel, for instance, the captain's clerk, it is necessary, we suppose, under this indictment, that the prosecution must show that he was guilty of such misconduct in the performance of his duties, in selling and taking tickets, so that they directly converged

to this fire: because, under this 12th section, the homicide must be occasioned by the misconduct, negligence, or inattention to his or their respective duties. So with the assistant pilot, and so with the other officers of the vessel.

"The next proposition is that, even if there be, as claimed by the prosecution, a general concert of action towards this race, yet, under this act, the officers of this vessel, not in command, and not in charge of the fire, cannot be held responsible for the fire. I am assuming the claim of the prosecution, admitting nothing; for although, as claimed by the prosecution, they might be guilty of misconduct in assenting to the race, yet their misconduct had reference to the race, and not to the fire; and, in the absence of any evidence, as in this case, on the part of the prosecution, to show that this fire was a direct consequence of that race, they must be acquitted. One word as to the opinion of Betts, District Judge, in the case of U. S. v. Farnham [supra]. I happen to know something about that case, although I was not one of the counsel who tried it. The boilers of that vessel exploded on the North river, at Malden landing, and it was shown, affirmatively, on the part of the prosecution, that there was a violation of the act of congress on the part of the officers of that vessel, in not causing the safety valve to be raised at each landing place; and the prosecution claimed, and direct affirmative testimony was given to show, that that collapsing of the boilers arose from the pressure of steam, which pressure was occasioned, in a great measure, by the negligent act of the officers of that vessel, in not doing that which they are enjoined to do by the act of congress. I state these facts with reference to this opinion, in order that the court may see that it is entirely a distinctive case from the present. There was evidence to show that the collapsing of these boilers arose from the want of a performance, by the officers of that vessel, of the duties enjoined upon them by the act of congress. This was a charge to the jury. It was not brought up in any authoritative way, so that counsel upon both sides could discuss this particular question of law. The case was entirely distinctive from the present case, and I do not think that any more weight should be attributed to it than to those English cases which I have cited, and which were determined upon in solemn consideration by a bench of judges. May it please the court, gentlemen of the jury, the duty has now devolved upon me, to open this case on the part of all the defendants charged in this indictment. I represent, in fact, only four of these defendants; but, my colleagues not wishing to trifle with your patience in having three openings of this case on the part of the defence, the duty devolves upon me of representing all the defendants. It is with the most profound emotion that I rise to address

you upon this occasion. We have here upon trial six men of the utmost respectability, who are charged here, after all, for nothing more than negligence, by the prosecution; and they are charged with an offence of the gravest magnitude, the effect of which will be to consign them to what would be worse than death to them,—a living tomb. I feel, gentlemen, the responsibility of the task which I assumed here in opening this defence. I look upon the one side, and observe two prosecutors, who, by their acts in this case, have shown their determination to convict these men of the offence with which they are charged before you,—an offence of the gravest magnitude. But yet, when I look to my clients, I feel reassured by the innocence of their looks; and, thus imbued with this profound conviction of their innocence, I rise to address you upon this occasion. Now, what is the offence with which they are charged here before you? So far as regards the act of congress under which they are charged, or so far as regards the particular indictment under which they are brought to trial before you, there is no fact—no circumstance—which would give any notice to these gentlemen of what they are to meet in this case, nor had they any notice, in point of law, of what they were to rebut, until the evidence was given on the part of the prosecution. I say, therefore, that they are bound to consideration in that respect. Men charged with the consequences of negligence, how difficult it is to show exactly, step by step, every act which they did upon that day. Yet this act of congress is very comprehensive. It is very general in its provisions. The indictment is equally general. It does not allege any duty which they are called upon to perform, nor any breach of that duty, except in most general terms; and, so far as regards the act of congress and the indictments, the defendants knew nothing, until they were brought into court, of what they were to meet. Now, gentlemen, on the 28th of July, 1852, a most appalling catastrophe occurred upon the North river, by which a number of human beings were sent into eternity. So awful and dreadful was this catastrophe, that immediately the public papers took it up, and the public jumped to the conclusion that these men were necessarily guilty of misconduct or negligence. It was spread through the land, and, when this case was referred to, it was called 'The Henry Clay murder'; and whenever it was brought up in any court of justice, the 'Henry Clay murder' was a constant expression. But, gentlemen, very fortunately, fifteen months have elapsed since that occurrence, public excitement has, to a great degree, died away, and, very fortunately for these defendants, they now stand before twelve men who are unprejudiced, and who come to this cause with no bias in their minds.

"Gentlemen, it is a fortunate circumstance, and one which these defendants rejoice in, that they are enabled, for the first time, to spread forth their defence before the public, and to justify themselves in the eyes of the world. What must have been the feelings of these men during the last fifteen months? How dreadful, how agonizing, must have been their thoughts, when at every turn they were charged with the most heinous of offences? But truth will prevail at last, and I appear before you now to develope what we conceive to be the truth in this case, and to justify every one of these men in what they did. We deeply deplore the calamity that ensued, but we will show you, by evidence and by facts that will not lie, that they are innocent of any guilt in the premises. The prosecution here claims that on the 28th of July the Henry Clay started from Albany a little in advance of the Armenia, and that, shortly after, a race occurred between those two boats. They claim, further, that that race was the cause of a fire which ensued some eighty-five miles below, where these vessels were shown to be in close proximity to each other. No evidence has been introduced here by scientific men, by engineers, or by any one who, by reason of their vocation, ought to know,—no evidence has been introduced,—to show that the fire was legitimately the result of that alleged racing. Let us suppose there was racing on that day. Does it follow that the vessel was set on fire by that racing? If the boiler had burst upon that, it would be perfectly legitimate to infer that the boiler burst from the race. But it does not by any means follow that, because there was a race eighty-five miles above the scene of the catastrophe, of necessity, that fire originated from that race. Now, gentlemen, in order to rebut any possible conclusion or inference upon your minds by the evidence which the prosecution has here introduced, we will put upon the stand engineers of the greatest respectability, who will show, by their scientific testimony, that this fire could not have occurred from any racing; that this vessel might have been driven to its extremity of speed upon that day, yet the boilers of the vessel were so arranged, water bottomed, the fire surrounded on every part by water, that it was impossible, in the nature of things for the fire to originate from that racing.

"We will not put upon the stand a man brought from Yonkers, who knew nothing about steamboats, nor had been engaged in any capacity on board a steamboat, but we will put upon the stand scientific men, who know what they are talking about, and to whose evidence you are bound, gentlemen, to give the utmost reliance. Was there any racing on that day? I shall not go over the evidence of the prosecution, for it is out of place in the opening of a case for a counsel to recapitulate in minute terms the evidence introduced upon the other side. I will merely generally allude to it. You have all heard the evidence of these excited passengers (Mr. Minturn and so forth), from the commencement to the end, a great many of

whom differ in the details of this occurrence. One of them makes this collision one and a half miles from the western side of the river, another makes it almost on the western side of the river, and a third places it just reaching Kingston dock. A number make it four or five miles above that place, and one goes so far as to say eight or ten miles above Kingston dock. We will put upon the stand pilots of long experience on this river, who will develope to you the channel of that river, and who will show you how devious and winding that channel is from Hudson down, and that it runs from one side of the river, and goes again to the other, until it reaches Kingston; and what struck these excited passengers as being racing, from the fact that the Henry Clay came out to meet the Armenia, was nothing more than the Henry Clay pursuing the natural channel in her navigation. We will put upon the stand pilots who will explain to you about the collision of these two vessels; that it arose from the principle of suction, and that, when two vessels of a class, or nearly of a class, as the Armenia and Henry Clay, are in close proximity, the principle of suction is such as would bring them together; and that what the officers of the Henry Clay did upon that day was perfectly proper, under the circumstances of the case. They had excited passengers on board, crying out. 'What must we do?' The Armenia was in their way. We will put upon the stand passengers who will show that the Armenia came out and met the Clay, and that the Clay endeavoured to avoid the Armenia, and for that purpose, on one occasion, run inside of a sloop, not a great distance from the eastern shore, in order to avoid her (the Armenia). We will put upon the stand witnesses to show that on that day the Henry Clay was not making her ordinary speed; who will prove that she could make twenty-seven and twenty-eight revolutions of her wheel in a minute, and that her speed was from twenty-one to twenty-two miles an hour; and, further, that at different landing places upon the river she was behind her time. When you connect that fact, gentlemen, with the fact that at the time she was run ashore she was an hour or an hour and a quarter behind her time, can you arrive at the result that there was racing on that day? It is absurd to talk about it. There was no racing on that day, and, for fear that there should be racing, an agreement was entered into between the owners of the two vessels, before she went on her trip to Albany, that there should be no racing, and that the Armenia should keep behind the Clay on the up trip and down trip. Yet, gentlemen, for fifteen months has it been bruited throughout the land that these vessels were engaged in a deadly strife, that pitch and tar were used, and that the utmost means were resorted to by the officers of that vessel to beat the Armenia. Why, gentlemen, it was, as stated by one of my colleagues, a 'cripple's race.' One witness testifies that he got on board the boat at Hudson, which is thirty miles from Albany; that he started a little before seven; and that she was going fourteen miles an hour. One witness gets on at Poughkeepsie at 12 o'clock, which is seventy-two miles from Albany, and she was then going about fourteen and a half miles an hour, and, at the time she was run ashore, it was from three and a quarter to three and a half o'clock p. m., being eight hours from Albany, a distance of one hundred and thirty-five miles, which would make her rate of speed from fifteen to sixteen miles an hour. If they had been going twenty-one or twenty-two miles an hour, for eight hours, they might have reached Sandy Hook.

"Thirty years ago, for a steamboat to go eight or ten miles an hour was considered extraordinary speed; but such has been the force of American energy and go-ahead-itiveness, that from that time to the present, improvements upon improvements have been made in the speed of vessels, and it is well known that there are now in our harbours vessels that go from sixteen to twenty-three miles an hour. But the prosecution says that in order to race they made extraordinary fires; that these extraordinary fires were made seven times hotter, in order to keep up the steam; and the safety valve was bound down, in order to run this vessel at the extraordinary speed of sixteen miles an hour. For that purpose, they have introduced some passengers who stood, on a hot day, on the promenade deck, in the vicinity of the engine room and her steam drum, and they found it hotter than they ever found it before. What they meant by that, gentlemen, does not appear before you, as these witnesses are not shown to have had any experience on steamboats. It is absurd and ridiculous for the prosecution to send six men to the state prison upon evidence like that. We have to meet that evidence, however ridiculous and absurd the testimony is, but we shall be able to place upon the stand witnesses who will put a quietus upon it. We shall show, in reference to the construction of the Henry Clay, that this steam drum or chest on the promenade deck was uncovered, and the reason of its being uncovered was for greater security against fire. It was found by one of the owners of this vessel that another steamship belonging to him had taken fire from the steam drum being covered, and, consequently, on this boat a different regulation was made use of. It would very naturally happen that persons standing on the promenade deck, with the steam drum uncovered, on a hot day, and but little breeze above the highlands, would feel very warm.

"Now, as to the subject of extraordinary fires. When steamboats intend to race, they take on board an extra quantity of coal, they employ extra firemen, they break them up in-

to many watches, and do a great many things in order to carry out the race; but we will show you that on that day no more coal was taken on board than usual, and that there was no tar, pitch, or rosin on board. Lackawanna coal was used, and that of the best quality; and no extra hands were employed besides the regular men. We shall show that there was but a little breeze above the highlands, and, further, that from the commencement of the voyage until Catskill, the pressure of steam, as indicated by the gauge, was much less than she was allowed to carry by law. One word upon that subject. They have introduced upon this stand an aged man, who, from his testimony, has shown his liability to make mistakes, for the purpose of proving that the certificate of that vessel only allowed her to carry thirty pounds of steam; but we shall show to you, by a number of witnesses, although that certificate has been consumed by the flames, that that certificate allowed her to carry thirty-five pounds of steam; and, further, that it was perfectly safe for the boilers of that vessel to bear fifty pounds of steam, and that they were built with the intention of carrying seventy-five pounds; but for greater security, and at the request of the engineer himself, the certificate was narrowed down in one year from sixty pounds to thirty-five pounds, and the reason was, not as Curtis stated, because he saw some defect in the furnace, but because, although the boilers could bear sixty pounds with safety, yet it might not be with safety to the other parts of the machinery of that vessel, for in the spring of 1852 an alteration was made in her spring cylinder, and a larger one was put on board. We shall show that the fire room of that vessel was better constructed than that of any other vessel of her class on the North river, and that with her boilers below deck, she had greater precautions against fire than any other vessel of her class. We shall show that she had—which few vessels were furnished with at that time—a steam cock, for letting off the steam, in order to extinguish the flames. We shall show that these boilers were properly covered with the usual covering; that they were far back, where no fire could reach; that the fire broke out on the starboard side of the starboard boiler, immediately under the grating, on the side of the vessel where no fire could reach. We cannot account for this fire. We did not set the vessel on fire, because, gentlemen, it would have been too great a loss to the owners of this vessel. They will lose by this catastrophe $200,000. It is a deep and abiding calamity to them. This fire occurred either from accident or design. If it occurred from accident, it was no accident that happened through the acts of any one of the firemen or the officers of that vessel. We can imagine how it occurred, but we are not called upon to show how. We could refer to the testimony of Mr. Wilkes, who was so prophetic upon that day, but who has never been so prophetic since. We could show that a lying, drunken fireman was discharged from his employ, and a great many other facts; but it is enough for us to show that on that day it occurred through no negligence, misconduct, or omission upon our part.

"The prosecution claims that, if the pilot had put that vessel ashore in an angular sidelong position, the passengers could all have escaped. For fifteen months has this been bruited about in the public prints of the United States. Men knowing nothing of steamboats have discussed eloquently upon this subject. That is one of the most cruel things that has ever occurred in this case, and I say that the pilot, instead of being indicted, should have received from those passengers who now malign him a testimony for his good conduct in putting the vessel on shore. That pilot is one of the best men of his class in the state of New York. He has a rough exterior, but a kindly heart; for, although his pilot-house was in flames, and the boards crackling at his feet, and although he ran the risk of being crushed by the steam pipe and walking beam, yet, like a Roman sentinel, he stood at his post, and did not abandon it. We shall produce evidence to show that, had the vessel been run ashore in an angular or sidelong position, she would have shot off into the stream, and every soul on board would have perished. We shall show, by the most competent witnesses, that the vessel was put on shore in the most proper and scientific manner. We shall put upon the stand, if we deem it necessary, the pilot of the Hendrick Hudson, who was run into by a sloop, and, in attempting to run his vessel sideways on shore, came very near losing her and all the passengers he had on board.

"It has been claimed by the prosecution, that if the officers on board the vessel that day had performed their duty, and had they given directions to the passengers what to do, the lives of all would have been saved; and it has been harped upon, in the course of the trial, that there was an order given to the passengers to go aft. Now, supposing that it was so, it was a perfectly proper order, as will appear by our evidence. This vessel was going to the shore head on, as was right and proper. If it had been a rocky bottom at the place where it struck, the effect would have been that the vessel would have been broken in two. If this had happened, her boilers would have collapsed, and all those who were forward would have lost their lives. Another circumstance was, the bow of of that vessel could not, by any possibility, hold a quarter of the passengers upon it. Suppose, then, that the order had been given to rush forward. In a body of four hundred excited passengers, having the fear of death before their eyes, how many of them would have found a place of security there? Why, as it was, when the vessel reached the shore, there was not standing room even for those who were already there. You would, therefore, have enacted there the same scene that

takes place where a theater is burned. and the doors are shut, and no one can get out. The same fears, the same struggle to get out and get forward, would have ensued; and yet the prosecution, in their ignorance of what they were talking about, got up and introduced testimony in order to poison your minds. But we shall show that so intense was the excitement that, even before the vessel had reached the shore. between thirty and forty (and some say as many as fifty) persons leaped off into the river. In such a state of things, there was absolutely no use in trying to restrain them. Many of us, indeed, did try to do so. The officers tried it, but it was found impossible to succeed. The passengers were panic stricken, and, like every panic stricken crowd. rushed they knew not whither. It was. as described by one of the witnesses for the prosecution. a beehive. Now, gentlemen, what could the officers have done on that occasion? Mr. Hubbard, the pilot, was in the pilot house. He did not abandon his position. We shall show you that Mr. Collyer, Mr. Elmendorf, the engineer, and the barman, were all engaged in pouring water down the fire room, in order to check the fire. We will show that one of the officers was on the lower deck. and ordered all to. go forward; that persons were sent to. the crowd to tell them that when the boat reached the shore, they should go forward; and that, when the vessel did reach the shore, every officer in the vessel, as soon as they saw persons struggling in the water for- their lives, sprang forward to save them. Now, for the last fifteen months, the brunt of this offence has been charged on Mr. Collyer. Every one has united in condemning that gentleman, and yet no one exerted himself more than that same Mr. Collyer. As soon as the vessel reached the shore, he did not spend his time in hunting after his carpet-bag, or standing on the shore, crying 'Oh dear!' but he sprang to a fence, broke it down, rushed with it into the water, placing boards within the reach of all that it was possible to approach, and was the means of saving fifteen persons. He rescued so far as man could by his own unaided exertions. What did the engineer do? He was in the water likewise; but, for a part of the time, he was endeavouring to scuttle the vessel, thinking that by sinking her the fire could be put out. or the flames quenched, or that the vessel might be made to touch the bottom, and the lives of the passengers be thus to some extent rescued. Captain Tallman had on that day been confined to his berth from an attack of the cholera morbus, and unable to be on deck, except at intervals, for the purpose of breathing fresh air. Though he was taking calomel. a kind of medicine which rendered it exceedingly dangerous for him to go into the water. yet he sprang in, got hold of a boat, made two voyages in it. and was the means of taking to land some nine or ten ladies.

No efforts made to save the passengers! Why, their efforts were superhuman. They did all that men possibly could; and when Capt., Tallman reached the shore, he had to be carried on board the Armenia, almost insensible. and was obliged to be immediately put to bed. What as to the pilot? He was in the water, and I could relate to you several touching incidents of his acts, when his kindly nature was aroused. Mr. Jessup was up to his neck in the water, doing all he could, though he was unable to swim. Mr. Elmendorf, too, was making exertions. There was not an officer on board that boat. whether engineer, assistant engineer, pilot, or assistant pilot. captain, or Mr. Collyer, that did not make more than human exertions in order to save the lives of those passengers. Why did not the prosecution ask Mr. Minturn whether anything was done to save the lives of the passengers? They did not; and, if they had, it would have let us understand what they were endeavouring to set up. and we could have elicited that on that day Mr. Collyer made most superhuman exertions.

"But it is said that the vessel was not seaworthy. On this subject I will make a few remarks. We will introduce evidence to show that the vessel was built by one of the most talented shipbuilders in the United States, Mr. Collyer; that she was built with a view to rapidity of motion in the water, and also with a view to safety. We will introduce evidence to show that the witness Edwards, who said he saw wood around the smoke chimney charred, must have lied, because there was no woodwork touching it. On the contrary, there was such an opening that there was at least a foot of space between the chimney and the wood. and. besides that, there was a protection of canvas on each side. I will show, too, that the vessel was built in every respect with an eye to security. and especially to safety from fire. We will show that she had twenty-four buckets for water on her hurricane deck, and two boats, capable of containing fifty passengers, and four chain buckets on her forward deck, that she had a steam cock to let off the steam, for the purpose of extinguishing any flame, steam being the best extinguisher known; that we had one of the most experienced masters on the river, who, however, on that day was unfortunately sick, and confined to his berth; that we had one of the best pilots on the river. one, also, of the best engineers,—the man whom Cornelius Vanderbilt would not go to sea without,—and one of the most scientific and careful pilots in the craft; that we also had a good second pilot. and a good clerk, who was selling tickets, and is now claimed by the prosecution to have set the vessel on fire. We shall prove that it was a steamboat of the most improved model, and we will show, on the part of the officers of the vessel. the best possible character for care, skill, and caution.

"Now, in conclusion, let me beg of you not to listen to the voice of prejudice. For fifteen months have these men been pursued with public odium, their characters maligned in every possible way, standing under this indictment; in another county actually charged with murder; fortunately, however, able to quash that; then charged with manslaughter, actually, under that indictment, in another county, pressed vigorously, too, by the prosecution for fifteen months. Nor were the public, notwithstanding, satisfied with that. During the whole period, the officers of the steamboat and the owners were pursued with public odium. The matter was spoken of as the steamboat so and so, commanded by Captain Tallman, and piloted by Edward Hubbard. During the entire period, they suffered intensely and agonizingly from the attacks upon their character, many having wives and children, most of them having those who were near and dear to them depending on them for their subsistence, and suffering the most intense anxiety for the result of this prosecution.

"I beg of you, gentlemen, in conclusion, that you will not listen to the voice of prejudice, but that you will calmly and dispassionately consider the testimony submitted to you. When we get through, we will scotch the snake; we will put an end to the malignity of the prosecution."

Evidence at great length was introduced by the defence to prove the facts contained in their opening.

The case was summed up by Mr. Jordan, for Collyer, and by Mr. Wheaton, for Germaine. Mr. McMahon, after their summing up, declined to speak. Mr. Wheaton then commenced summing up for the defence. As it had been remarked by the counsel who opened the case, it was one undoubtedly of very great importance in its results, both to the public, who feel a deep interest in it, as well as the defendants themselves. Most certainly it was so to the latter, for on this occasion the jury had before them men who had not heretofore been charged with crime; men who had, up to the time of the destruction of this boat,—he might say up to the present time,—held as high a position in society, and had had the confidence of the public perhaps as much as any of their fellow citizens that could be selected from this city. They were men accomplished in the employments in which they were individually engaged, and their employments were such as the public had the deepest interest in having responsible or skilful men employed to perform. They were arraigned upon a high charge, with being the criminal authors of the most extraordinary destruction of human life that has occurred for some time. If the crime which has been alleged against them shall have been proved, it will expose them to one of the highest punishments known to our laws; they being liable to be consigned to the state prison for a period even of ten

years, their characters, of course, too, to be destroyed in the estimation of the public, and themselves to be cut off from society, and even be deprived of their liberty. The jury saw, therefore, that the case was of the utmost importance, but still they came into court, and presented their defence with the utmost assurance, and the utmost confidence that, after a fair examination of the evidence that had been produced on the part of the defendants, the jury would be satisfied, not only that they were not guilty of the crime which had been charged against them, but that there was not the semblance even of a crime made out against them. There was no doubt this was a case in which the public had felt a deep interest, arising, as it did, out of an almost unparalleled destruction of human life; and a feeling had got abroad that the whole case should be thoroughly investigated, and, beyond a question, it was peculiarly proper that a thorough search should be made, to ascertain, if possible, whether any one was the criminal cause of the destruction of human life in question. But they must act against individuals only upon evidence, and he did say that, if there had been no more evidence before the grand jury, on which to ground their presentment against the accused, he was amazed how it was possible that they could have come to the conclusion of there being prima facie evidence against the defendants. But they all knew how investigation before coroners' juries was conducted; that only one side of the case was presented for consideration, and that the defendants had no opportunity of cross-examining the witnesses, or of discussing the testimony, as to whether it was sufficient to ground an indictment upon it, or even presented a case that was proper for investigation.

He would next call the attention of the jury to the statute upon which the indictment was framed; see what it was the defendants were charged with, what testimony would be required for conviction, and then look at the evidence in the present case, to see whether really there was a single fact on which the prosecution could rely for the purpose of obtaining a verdict. This indictment was founded on the 12th section of the act of congress, entitled "An act to provide for the better security of the lives of passengers on board vessels propelled in whole or in part by steam"; and he called their attention particularly to the wording of the section. "And every person employed on such steamboat, propelled wholly or in part by steam, by which misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person or persons on board may be destroyed, shall be deemed guilty of manslaughter, and, upon conviction thereof, shall be sentenced to confinement with hard labour, for a period of not more than ten years." The first thing to be found upon this was whether the persons charged with the offence

were employed on board such a boat, and had some distinct and particular business on it to perform. Then, what misconduct, negligence, or inattention to their respective duties had they been guilty of. Then, you must find a particular act. in each instance, against each of the defendants charged. In the case of an indictment arising out of a boiler explosion. Judge Betts laid down that, by the misconduct, negligence, or inattention in question, was undoubtedly meant the omission or commission of any act, the necessary or most probable result of which was the loss of human life; and, no matter what amount of misconduct the parties were guilty of, it must be shown, clearly and distinctly, that the misconduct led to the destruction of human life in question. Let them now apply that to the present case. The jury had heard about the inspector's certificate, but the inspector had not power to compel obedience. He could only give a recommendation as to the quantity of steam, and the parties might follow it or not, just as they chose. Great stress had been laid by the counsel for the prosecution upon the fact, which they strove to establish, that the limit was thirty pounds, but there had not been a particle of proof that at any time during the whole distance between Albany and Yonkers, she had carried an ounce of steam beyond thirty pounds; but, moreover, the weight of evidence was most decidedly in favour of the defendants' position, that the amount of steam fixed was thirty-five pounds. There was to this point the testimony of one of the firm of Radford & Co., and several other witnesses, to that effect. Even from one of their witnesses' testimony, it was as likely that it was thirty-five pounds, as thirty.

Let them take the different officers, and see what they had been guilty of. What misconduct, for instance, had been proved against the engineer? Had he not managed, in the most skillful manner, so far as his part was concerned, up to the moment that the boat struck the land? He challenged the counsel for the prosecution, when he stood up, to point out any act of his which was criminal,—any omission to perform his special duty. If he could not show this to the jury in letters of living fire; if he could not show it to them so plain that the wayfaring man. though a fool, could see it; if he could not point it out to them so plainly that the human eye could not be deceived,—then, appealing to the true spirit of our law. that a man is not to be presumed to be guilty until his criminality is clearly and satisfactorily established, he should ask them with confidence for their verdict on the part of the defendants. Then, what had been proved with respect to the pilot? The prosecution had, indeed, only attempted to urge one fact against him, and that was that. crossing over to his landing place at Kingston. he had run his vessel in contact with the other. and that this was a culpable act on his part; he having at the time the control of the helm. Well,

even supposing the jury had found that this had been a wrong act, though undoubtedly his vessel had been chased by the Armenia, either in the endeavour to make the landing first, or to get into the suction of the Henry Clay, this act could not be said to have any connection with the burning of the vessel. It was eighty-five miles from the place where the fire had been first discovered, and the contact had been appropriately described. by one of the witnesses as a blow, and then separate. The Clay had not been injured at all; not even had her paint been rubbed. All the time of the accident, much excitement had prevailed, and every slander that human ingenuity could suggest had been thrown out against the accused. Indeed. to such an extent did the excitement go, in relation to the matter, that, looking back at it now, and considering it coolly, they could only regard it with astonishment. The catastrophe was undoubtedly an awful one, and the public, in their indignation, did not stop to examine whether this person or that person was guilty, but with one general voice exclaimed against all the officers: "They are guilty; punish them." A victim was demanded, and the voice was, "Let us pay back life with life;" but the laws were not now so vindicated. This had gone out with paganism. The time had been when, if the wind blew unpropitiously, the oracle was consulted. and the answer was that the storm should be appeased by the sacrifice of human life; but that time has passed. Punish the guilty by all means, but let them take care that it was the guilty they punished.

The defendants were charged with bearing on the waters a precious burden of men. women, and children; but let them punish the innocent, and what would the navigator say? That it made no difference, let him be as careful as he could, when the public indignation was raised, and a victim called for, it took the innocent, as well as the guilty. It was a happy thing in the administration of our laws, whenever there was a great deal of excitement prevailing against an individual charged with a crime. to put it off until the public mind had settled down under the excitement.. In the present case they had waited until the excitement was in some measure subdued, and the consequence was that, instead of having the court crowded with spectators, there was only a small gathering, for the purpose of gratifying their curiosity, rather than from revenge. He would now read from Starkie (page 478) a distinction in criminal cases, as contradistinguished from civil ones: "The distinction between mere proof and mere preponderance of evidence is very important. In all criminal cases it is essential to a verdict of condemnation that the guilt of the accused should be fully proved. Neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficient, unless it generates full belief of the fact, to the exclusion of every reasonable doubt." It was laid. down in the 507th page that the conclusion to-

be drawn should be fully established; that if the basis was unsound, the superstructure could not be sound; that the party upon whom the burden of proof rested was bound to prove every single circumstance which was essential to the conclusion, in the same manner, and to the same extent, as if the whole issue rested on the proof of such individual and single circumstance.

An attempt had been made in this case to prove that there had been racing, and inferences were sought to be drawn from this; but, before this could be done, they must first be convinced of the existence of the fact that there was racing. But not only was there no evidence as to this, but every fact and circumstance went to show that not even was there any attempt at it: that, even if the racing had been proved, it was not shown that the fire in question had resulted from it.

The evidence of Mr. Belknap went to show that the furnaces were surrounded with water, and that, consequently, it was utterly impossible to raise the heat to such an extent as to set fire to the woodwork by radiation.

(Counsel then proceeded to review the evidence produced for the defence, and concluded by saying): "With respect to Mr. Ridder, I shall say nothing, in consequence of the fact of their having disparaged his testimony, by showing that he told a very different story at the indignation meeting. From the appearance of the man, and the circumstances that transpired during the examination, I apprehend that he was a little desirous of making a speech there which would satisfy his hearers, and, in all human probability, he said things then that he was unwilling to corroborate under oath. He was making a speech to an excited meeting, that would not listen to any vindication of the officers, and I apprehend that he told stories then which he was not afterwards willing to corroborate under oath. I will therefore pass over his testimony.

"With respect to that of Mr. Van Buren, which there can be no reason to disbelieve, instead of there having been anything criminal on the part of the pilot of the Henry Clay, in what he did, it would appear that he did nothing more than what was right for a vessel under such circumstances to do, in order to obviate what the Armenia was endeavouring to accomplish by dragging herself along in the Henry Clay's suction, in trying to make the landing at Kingston before her.

"I appeal to you, in conclusion, whatever else may happen, whatever may be the strifes or disputes, only keep sacred the altar of justice. Let the sword be wielded only by the hands of a pure and honest jury, and then when it strikes, the public voice will say 'Amen,' and when it acquits 'Amen.' It reverberates through the halls of justice, and will reach the utmost corners of our Union; and, that it may continue to be venerated, I call upon you on this occasion, if you are not satisfied of the guilt of these men, to say so promptly. There is a great deal in prompt-

ness. Let not the public think that you have doubted, because of a long continuance in deliberation. The facts are few, though so much time has been spent in this voluminous evidence. When you come to winnow out the wheat from the chaff, how much is there of the wheat left? How much out of the whole mass of evidence is there that bears upon any of the questions upon which you are to satisfy yourselves, before you pass your verdict upon the case which is now before you? Has there been a culpable omission on the part of either of these defendants? If there has, can we say, clearly and distinctly, that that act which we have marked down as culpable was the cause of the destruction of this vessel, and, consequently, the cause of the destruction of human life? Gentlemen, ponder upon these things, if you have doubt. If you have no doubt, let me ask you, in favour of these men, whom you would be proud to honour, and whom the very kindness of your hearts would prompt you to favour, say to them promptly, and in that pure, energetic language, consisting of these words: 'In our opinion, you are not guilty of the charge brought against you.'"

Mr. Jordan, counsel for Mr. Collyer, then proceeded to address the jury on behalf of his client. "If," said he, "I had the power, gentlemen of the jury, of taking the vote of the jury, whether they would hear any more on the part of the defence, I should feel very well satisfied, in my own mind, that any remarks which I am about to make would be excluded. It appears to me that such is the nature of the case, and such the demonstrations of innocence of all the parties concerned in this indictment, that it would be unnecessary to spend time in any further discussion. I did not expect, until recently, for reasons personal to myself, and therefore not necessary to mention, to take part in this discussion; but, feeling a little more like a man to-day than I have for the last three or four days, I shall endeavour to show you, beyond all doubt, that my client, Mr. Collyer, the only person with whose defence I am particularly charged, is entirely beyond the scope and pale of this indictment, and that to punish him, under the act of congress, is entirely out of the question; and, if I undertake to submit my views upon the general subject, which has been ably and eloquently discussed, they will be very general indeed. My object is, more particularly, to perform a dissecting process upon some of the testimony. I intend to show that all the witnesses who have sworn to facts relative to Collyer have so exhibited themselves before you as to entitle them to no credit or consideration; not that I intend to charge them with untruthfulness, but that they were so excited that they were unable to discriminate as to the facts which they swore to. It is one of the noblest efforts of the human mind to endeavour to raise it-

self above prejudice and error, and to arrive at truth; because truth is always the foundation of justice, and falsehood and fiction always the basis of every error. Courts of justice are instituted for the purpose of arriving at the truth. They were framed for that purpose. Facts are frequently coloured by men's feelings and prejudices, but when we come into a court of justice, where the balance is held equal and even, and where the judge sits with that equipoise which is necessary to the calm investigation of truth, it is there alone that we can arrive at the truth of the subject in controversy. It is that which distinguishes courts of justice from mobs. It is that which distinguishes courts of justice from those indignation meetings we have heard of; not that I feel disposed to cast any blame upon those persons who assembled at the Astor House for the purpose of passing resolutions upon this subject, because I know, under the impulse of their feelings, it was the only vent their human nature had to let off, so that, under the pressure and agony of their feelings, something might go forth to the community; and, though it was rather of a vindictive character, and the circumstances under which they were assembled unfavourable to the investigation of truth, yet it was a relief to them, which I have no disposition to find fault with.

"I shall proceed, first, to consider whether Mr. Collyer is implicated in the indictment, admitting that all the rest are to blame; and, secondly, I shall proceed to make a few general observations, for the purpose of gleaning a few facts. I will demonstrate to you that Collyer is not implicated; and, further, notwithstanding the efforts of the able prosecutor, which will be continued up to the death, I will show that all these defendants in this case are equally innocent with Mr. Collyer, who had nothing to do with the matter, and is not implicated in this transaction at all. You will recollect that this is an indictment under the statute of an act of congress, but it is not an indictment at common law, for no such an indictment at common law would lie. It is therefore under the act of congress alone that these parties can be indicted and punished, and they must be brought within the terms of that act of congress, one and all of them, in order to find a verdict against them. That act of congress, being a penal statute, must be strictly construed, and they must be strictly brought within it before they can be punished according to the penalties inflicted by the twelfth section. I will once more refer to the twelfth section of the act of congress, not generally, but for a particular purpose, which I have now in view: 'Every captain, engineer, pilot, or other person employed,' (it is the word 'employed' which I wish to call your attention to) 'and who shall, by any misconduct, negligence, or inattention to his or their respective du-

ties, destroy the life of any person on board, shall be guilty of manslaughter.' Now, the first question is, was Mr. Collyer employed on board this vessel? I beg to call your attention strictly to the section, and to impress upon you that no man can be convicted unless he comes within the meaning of the word 'employ,' and I shall ask his honour—which, I think, will be his obvious duty—to charge the jury that to convict Mr. Collyer, or any other person here, it must appear that he was employed on board the vessel at the time of the happening of this accident. Mr. Collyer was one of the owners; but the act of congress has nothing to do with owners of a vessel, and it has purposely omitted them. It would be unjust and improper to make the owners of a vessel responsible, in a criminal prosecution, for the negligence, misconduct, or inattention of those engaged in the navigation of the vessel. But if the owner goes on board, and takes charge of the vessel,—if any third person goes on board and takes charge,—if any man should substitute himself in the place of the captain, and, in case of illness, or from some other cause, assume the command of the vessel, he would, I am willing to admit, be within the true interpretation of the act of congress. The question, then, is, was Mr. Collyer in that situation? Mr. Collyer was a shipbuilder in the city of New York, carrying on such business here, and he constructed this boat as he had many others. He was the owner of five-eighths of her, and I shall show that he had performed his duty as owner by providing one of the best vessels that was ever built in this port, or that ever ran upon the Hudson river, and, so far as he was concerned, together with his co-owners, he provided one of the best set of men who were ever employed upon this river; all young, active, intelligent, vigilant, men. It has been satisfactorily proved that this vessel was fully equipped with boats and buckets, and that the hull of the boat was one of the most substantial kind; and one of the witnesses, a pilot, tells you that her running up on to the beach in the manner she did, and remaining unbroken, was an evidence of the substantial qualities of the frame of that vessel."

The learned counsel then proceeded at great length to dissect the evidence of Minturn, Gilson, Gourley, Connor, Hubbard, and Shelmore. He contended that, even supposing their testimony to be worthy of credence, Mr. Collyer did not lie under the imputation sought to be sustained by the prosecution, of having in any manner engaged in the control or management of the Henry Clay on the day of the calamity, and that, therefore, the twelfth section of the act of congress did not, in the slightest degree, apply to his case. He commented with particular severity on the contradictions in Mr. Gilson's evidence. The facts which Gilson attributed to have taken place in regard to

Mr. Collyer, at the time of the collision, were all facts which took place with regard to Mr. Ridder, and that this appeared plain and conclusive, there could be no doubt; for, when he (Mr. Jordan) pointed to Mr. Ridder, and asked Gilson if that gentleman was Mr. Collyer, Gilson said it was he. From this fact alone there could be no doubt but that Gilson did not know what he was talking about. Gilson might be an honest man, but he was a very unfortunate one. He (Gilson) was a man who looked across a gangway ten feet wide, and through an engine twenty feet wide, and saw forty marked on the gauge-rod of the engine, which had no number at all upon it. Gilson was determined to leave an impression upon the mind of the jury that the vessel was carrying forty pounds of steam, and the reason was because the carrying of this forty pounds of steam was a violation of duty, and beyond the amount allowed by the certificate. It was a maxim that a lie would stick to a man as well as the truth, but that fortunately it did not prevail in a court of justice. This was the description of evidence, in infinitesimal doses, by which the prosecution sought to prove that Mr. Collyer was managing the boat on July 28th; but he (Mr. Jordan) would as soon think of fattening an ass on the east wind as endeavour to fix Collyer as controlling the action of the boat on the day of the accident by such desultory and unsatisfactory testimony. At this point of the learned counsel's speech, the court adjourned until ten o'clock the next day.

Mr. Jordan resumed his address to the jury this morning. The counsel for the defense had been aware, from the commencement, that they would have little occasion to make use of Mr. Ridder's testimony, that it was a plain, simple, continuous narrative of the whole journey from Albany to the fatal spot, unembellished, unadorned, uncontradicted, but in fact corroborated by everything in the case. All he said had in fact been proved by other witnesses, so that they had little occasion to make use of his testimony. He (Mr. Jordan) should use it but little, although his learned associate had thought proper to abandon anything like a justification of the conduct and position of Mr. Ridder, and to give him up a prey to the district attorney, to be pounced upon as a lamb is pounced on by a vulture. He (Mr. Jordan) would now say a few words in his defence, not because his clients needed Mr. Ridder's evidence, but because he thought it unjust that any person should be so treated, who, by process of law, had been compelled, whether he willed or not, to come into court and give his evidence. He would show that the assistant editor of the New York Daily Times had not contradicted Mr. Ridder in any essential particular; but, first, he would express his regret that the counsel for the defence had not pertinaciously objected to the questions put

by the district attorney, and doubtless, the decision of his honour would have been to rule against it. In answer to the questions of Mr. Hall, Mr. Ridder said: "I cast no blame upon the officers. I said nothing about their firing up to a dangerous extent." Now let them see what it was that the assistant editor of the Times swore it was Mr. Ridder did say. He expressed an opinion as to the cause of the fire, attributing it to an unusual firing. "They made a hotter fire than was usual or necessary." Thus the jury would see that, while the witness said: "I cast no blame upon the officers. I said nothing about their firing up to a dangerous extent," all the assistant editor maintained was that Mr. Ridder "expressed an opinion" that there had been too much fire. He did not maintain that Mr. Ridder distinctly said so and so. Mr. Ridder could no more state the cause of conflagration than any one else could. No one could do more than surmise whether it arose from a match being thrown down there, or a cigar, or whether it was that some fiend in human shape had thrown down camphine, which, running along the heated timber, would account for the flames firing up so suddenly,—no one could do more than surmise,—or whether by the engineer opening the doors of the furnace to damp the fire, instead of pulling the safety-valve. Whether these things were so, Mr. Ridder and they all alike were in the dark, and could only surmise. Besides the assistant editor did not swear that Mr. Ridder said the firing up, if he ever did speak of such a thing, had been done by the order or with the knowledge or consent of the officers. Where then, after all, were the mighty contradictions? Mr. Hall next asked the witness: "Did you say anything about their continuing to race after remonstrance?" His reply was, "I did not." Now mark the words of the assistant editor: "He said that the officers were remonstrated with after racing." Mr. Hall's question, if it had been answered in the affirmative, would have been: "I said there was racing after they had been remonstrated with." The assistant editor only said: "Mr. Ridder said they had been remonstrated with after racing." Neither he, nor any one else, denied that there was racing at one particular point, but it had no connection with the catastrophe which caused the loss of life. The next question of Mr. Hall was, "Did you not say there were no buckets there to extinguish the flames?" The reply was, "No, sir; I did not say exactly that. I said he used all the buckets there were." That answer might certainly imply that there were buckets, and doubtless they were used until it was seen that they were of no use; and, if there had been ten thousand buckets there, they would not have been of any use, for the steamboat went off almost like a charge of gunpowder.

So much for Mr. Ridder,—a man who cer-

tainly had told a plain, consistent, orderly, narrative of the transactions of that lamentable day; so far as he (Mr. Jordan) could discover, without passion or prejudice in heart. he being, to a great extent, one of the sufferers, although he had not lost his daughter. Doubtless, however, he had not considered it just that those men should, without cause, be so universally condemned, particularly when he saw the meeting so gravely passing a resolution, sending forth to the world a statement that they had not been contented with the usual firing up on board, but had burned tar and resin, and pitch, and other combustible material. It was for opposing that resolution, too, that the engineer, who, having been down to the boilers after the catastrophe, and seen the marks of the quenched anthracite coal, knew that there was no other fuel used, was threatened to be thrown out of an upper story window. He (Mr. Jordan) did not know who led that indignation meeting, but he had been informed that it was a particularly precious individual for such occasions, though he would not mention his name; and, doubtless, if a resolution had been proposed which alleged that the officers had got the devil from hell chained down below, vomiting up fire and brimstone for the burning of the steamboat, it would have been passed; and, if it had, it would have been just as reasonable as the infernal one that the murderers—for such they would have been—of the Henry Clay had been firing up with tar and resin, and God knows what. He then proceeded to comment upon the evidence for the prosecution, saying, in the course of his allusions to the different witnesses, that he did not like the cut of Mr. Minturn's jib. That gentleman had attempted to impress upon the jury that a passenger was refused to be landed at Bristol, because of the boat being in such a hurry; whereas, on cross-examination. it turned out that he was nothing more than a drunken loafer. who was making a disturbance on board. and had made no demand at all to be landed until after the boat had passed the place. Dr. Wells he designated as a "do-no-harm do-no-good sort of a man;" and declared that he (Mr. Jordan) could, from personal trial, contradict his statement about the particles of anthracite coal as large as peanuts. He had tried with a newspaper to brush away such pieces, and could easily remove them in that way; "nay, I could do so with a cambric handkerchief." But he could not remove flat pieces of coal, such as might be naturally expected to pass from any smoke-pipe, and which were doubtless the kind that were blown over the decks and the awning of the Clay on the day in question. He held out to the jury. as a guiding polar star in this case, the consideration that they must positively find that the deaths in question. were occasioned by the act complained of, though it might not be necessary that the act complained of should have

been perpetrated just at the time of death; still the last must be clearly traced to it,—as clearly as ever the effect was traced to the cause. He maintained at some length that this could not be done in the present case, even according to the evidence for the prosecution. He concluded by expressing a hope that the magnanimity of the district attorney's nature would, despite his employment by the government, compel him not to do any injustice. even though he possessed the power, to those men who would stand that day in peril. if it was not that they relied upon the intelligence of the jury.

Mr. McMahon, after the able and eloquent addresses of his associates, declined addressing the jury.

Mr. J. Prescott Hall, for the United States, closed summing up. and said:

"May it please the court, gentlemen of the jury: This is now the fourteenth day that you have lent your attention patiently to the investigation of the facts in this case. I will not abuse that patience by any protracted examination of the testimony, but will endeavour to state. as briefly and clearly as I can, the law which is applicable to the case which is now before the court and the jury, and the evidence which the prosecution has adduced to support it. In endeavouring to discharge my duty, gentlemen, I shall make no effort to go beyond the proper limits, although I shall, on this occasion, discharge it without pain, because I. as a man, think that gross misconduct exhibited itself on the part of the officers of the Henry Clay on the fatal 28th of July, 1852. I will not endeavour. by any effort. to strain the testimony. nor shall I be willing to fall one inch short of it. for I conceive that by my duty to the government, as prosecuting officer. I am required. without fear and without favour, and without regard to the particular individuals who are charged, that I should discharge that duty in the best manner I am capable of. By the constitution of the United States. the commerce of the whole country is placed under the control of congress. The supreme court of the United States have, on many occasions, decided that the word "commerce." as used in the constitution. included navigation also. and that therefore the whole navigation of the United States, as well as the whole commerce of the United States, are under the jurisdiction and supervision of the people's representatives in congress assembled. At the time the constitution went into effect, and for many years thereafter, the mode of propulsion adopted on the rivers of the United States was such that the intervention of the powers of the law was not called for to check any abuses. or to guard people in their rights; but, after the discovery of that mighty and potent engine, which was thereafter to be used on all the navigable waters of this country, and perhaps of the globe. after these potent energies had been brought out, and applied to the propul-

sion of steam vessels, it was discovered by experience that great want of care had been exhibited on so many occasions that the people of the United States were not safe, in the prosecution of their ordinary business upon the water courses of the United States, unless they were in some degree protected from the acts of those who were their transporting agents. And so serious had this whole matter become, that congress, in 1838, passed a law upon this subject, which is significant in its very title. It is entitled 'An act to provide for the better security of the lives of passengers on board vessels propelled in whole or in part by steam.' It proceeds, then, to give a set of rules, which are to govern the conduct of those who are charged with guarding the lives of passengers on board of the vessels which they control, and which rules they have no right to disobey or disregard. And, in order that the utmost vigilance should be exerted, it is provided, after the passing of this act, that no vessel shall be permitted to navigate the waters of the United States, unless they take out a license, under the conditions which are imposed by the statute; that, in the first instance, the district judge should appoint competent persons to inspect the boilers and all hulls of the steam vessels; that the hulls of the steam vessels shall be inspected once in twelve months, and that the boilers shall be inspected once in six months; and to disregard this is visited with the severe penalty of the law. He then referred to that section of the act which made it the duty of the officers of vessels to let off steam at every landing place, or whenever the headway of the vessel should be stopped; and, in support of this, he cited Judge Betts in the case of The Reindeer [supra], to show that it was imperative, and that the captain had no discretion. But congress, not deeming the act stringent enough, passed the following statute: 'Section 12. And be it further enacted, that every captain, engineer, pilot, or other person, employed on board any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his, or their respective duties, the life or lives, of any person, or persons on board said vessel, may be destroyed, shall be deemed guilty of manslaughter; and, upon conviction thereof, before any circuit court in the United States shall be sentenced to confinement at hard labor, for a period not more than ten years." If this statute is to be applied to the poor fireman or deckhand, much more is it to be applied, to masters and owners on board the vessel, who take part in the navigation, and to the pilot in the wheelhouse, and the engineer in the engine room. Upon these persons rests the responsibility, and, respectable as they are, intelligent as they are, there is less excuse for their neglect of any duties which the law casts upon them, to have been the cause of this terrible calamity. What, because Mr. Collyer's ship-yard is to be shut up, is he to be held irresponsible for such acts?

"The whole theory of this case, rests upon the charge of mismanagement and negligence. I will state the theory that has been adopted by the prosecution in this matter. We suppose that this terrible accident occurred in consequence of the misconduct of those having charge of this vessel on the 28th of July.

"It is in evidence here that the steamboat Reindeer, which used to be the Racehorse, upon the North river, with the Henry Clay, had become disabled, and it was necessary to have some boat take her place. The Armenia, a boat of about equal speed with the Henry Clay, was selected for that purpose. She was to sail on the 27th of July, bound from New York to Albany; but, with a very cunning regard to their own interests, the owners of the Henry Clay had made a secret contract with those who were to navigate the Armenia that the Armenia, was to lie behind the Henry Clay, and that the Henry Clay was to be permitted to go to all the decks ahead of the Armenia, take in the passengers that first offered themselves, carry them to Albany, and deliver them there, and that on the return down the same course of conduct should be pursued. It is in evidence that this arrangement became displeasing to the charterers of the vessel. They therefore took Capt. Smith from his command, and gave the vessel in charge of Capt. Polhemus, and placed another individual on board to direct him in her management. After the vessel had departed from Albany, it was supposed, on the part of the officers of the Henry Clay, that this same arrangement was to be persisted in, and there was no reason to suppose that this arrangement would not be kept up until after the Henry Clay came to Hudson. When she came to Hudson, it was then discovered that the Armenia, in apparent violation of the arrangement which had been made between these vessels, instead of following the Henry Clay to Hudson, had gone down the west passage, avoiding the landing at Hudson, and made directly for Catskill. The instant the Henry Clay discovered this, it became the subject of conversation between the passengers, and it was so admitted that, when Mr. Collyer was asked whether the Armenia would pass the Henry Clay, the answer given by Collyer was that he thought she would not."

The learned counsel here entered upon a critical examination of the testimony introduced, and contended that the prosecution had clearly proved that the vessels were engaged in a fearful contest of speed, the results of which were the destruction of the Henry Clay, and the fearful loss of life. Such being the case, he called upon the jury to pronounce a verdict of guilty against the defendants, particularly Collyer and Tallman, who were in a position of life which

should have prevented them from doing that which they knew was contrary to law. The question which the jury had to determine was one of the greatest importance to the community, who were looking with intense anxiety to the result of the present trial. Mr. Hall wished to ask whether there was any validity in an act of congress, or whether it was null and void. If the former proposition was correct, the defendants must be convicted; if the latter held good, they would be acquitted.

INGERSOLL, District Judge (charging jury). There is a prospect that we shall now bring this protracted trial soon to a close. It has occupied a very considerable portion of your attention, but not, in my judgment, more than was due to the transaction which had to be investigated. I am glad to be able to say, gentlemen, that you have thus far exhibited that patience, and given that attention, which the case requires. It has been intimated, during the progress of the trial, that injustice had been done to these individuals under trial from the fact that they were not enabled to have separate trials, for the reason that, if they had had separate trials, the testimony of those not on trial might have been used in defence of the others who should be tried. In the examination of this question, when the motion was made for separate trials, I gave my reason why separate trials should not be granted, and I will again state, in this place, gentlemen, that, as they have been indicted by the grand jury jointly, if they had been permitted to have had separate trials, the one who should have been tried first could not have called upon the others to testify in his defence. That is the law. It has been so decided, upon solemn argument by the supreme court of the United States, and to that decision we must all bow. I therefore say, gentlemen, that if they had been permitted to have had separate trials, the one who should have been first tried would not, in law, be permitted to call upon the others to testify in his defence. In the year 1838 the congress of the United States, in view of the many startling disasters which had happened upon the waters of the United States to vessels propelled by steam, by which great loss of life had been occasioned, passed a law, the object of which was, as appears by its title, to protect the lives of passengers on board vessels of that description. That law, among other things, provides: "That every captain, engineer, pilot, or other person employed on board of any steamboat or vessel, propelled in whole, or in part by steam, by whose misconduct, negligence, or inattention to his, or their respective duties, the life or lives of any person or persons on board said vessel, may be destroyed, shall be deemed guilty of manslaughter, and, upon conviction thereof, before any circuit court in the United States, shall be sentenced to confinement at hard labour, for a period not more than ten years." The indictment which you have to pass upon is founded upon this violation of this act of congress. It charges that Thomas Collyer, John F. Tallman, John Germaine, Edward Hubbard, James L. Jessup, and James Elmendorf, the parties now on trial, in July, 1852, were employed on board the Henry Clay, a vessel propelled by steam, and navigating the waters of the Southern district of New York; and that, while they were thus employed, the lives of several passengers on board the vessel were destroyed by their misconduct, negligence, and inattention to their respective duties. To the charges set forth in the indictment, the individuals named therein, and against whom the charges were made, have severally pleaded that they were not guilty.

The question, then, at issue, and upon which you, upon your oaths, have to determine, is whether they are guilty, as charged in the indictment; and, to enable you to come to a correct result, it is necessary that your attention should be directed to certain inquiries which are involved in the question at issue. These inquiries are: First. Whether the lives of the persons named in the indictment, or the lives of any of them, have been destroyed? Secondly. Whether they have been destroyed by the misconduct, negligence, or inattention of any one? Thirdly. Whether the individuals against whom the charges in the indictment are made were employed on board the Henry Clay at the time such lives were destroyed. And, fourthly, if they were thus employed, whether such lives were destroyed by his or their misconduct, negligence, or inattention to his, or their respective duties? And in considering the case now to be submitted to you for your determination, it is important that you may come to a just conclusion, to bear constantly in mind certain rules of law, which should govern trials in all cases involving in their consequences a punishment that is infamous; which should govern them in all criminal investigations, and particularly in those investigations which are of an aggravated character. These rules are, that every one accused of crime, whether the offence charged be one of commission or omission, whether it be criminal or culpable neglect, shall be presumed to be innocent until the contrary appears. He should be considered as innocent until his guilt is made to appear manifest by evidence given in court; and, when upon evidence given in court there is in the minds of the jury a reasonable doubt of the guilt of the accused, no matter what the charges may be, he who is accused should have the benefit of that doubt. By the law which governs this court, and which also governs all well-regulated courts, he who is in an indictment charged with crime is not called upon to establish his innocence. That duty is not imposed upon him. His innocence is considered to be established until, by convincing proof brought forward in court, that presumed innocence is destroyed. It is the duty of the government to convince the jury, beyond a reasonable doubt,

of the guilt of him who may be indicted, and not the duty of the accused to convince them of his innocence; and, if the jury are not convinced beyond a reasonable doubt of the guilt, then it is the duty of the jury to acquit. The disaster which gives rise to this prosecution, at the time at which it occurred, deeply excited the feelings of the community, and the public mind, for a considerable period, was in such a state, that, if the trial of those implicated—or, I should rather say, of those supposed to be implicated—had taken place soon after it happened, there would have been some danger, and, I may add, there would have been great danger, that that calm and dispassionate investigation might not have been given to the investigation of the truth which is due to all subjects of inquiry in a judicial tribunal, and particularly to a subject demanding so much impartial investigation as the one now to be submitted to your determination. But that excitement has now passed away, and you, as impartial jurors, sworn to a faithful discharge of your duty, have been selected to pass between the government and the accused, and I have no doubt that the duty which devolves upon you will be faithfully performed.

I have told you what duty devolved upon the government before they could claim a conviction. It is also incumbent upon me to state what is not required of them, and what is no part of their duty, in conducting the prosecution. It is not required of them to prove willful or intentional mismanagement or misconduct on the part of the accused. In a prosecution of this kind, it is not the intent which constitutes the essence of the offense, but it is an improper act, although unaccompanied with any evil intent or negligence, in the performance of a proper act, or inattention to any duty imposed upon any captain, engineer, pilot, or other person employed on board any steamboat or vessel, propelled in whole or in part by steam, when by such improper act, or negligence in the performance of a proper act, or inattention to any duty imposed upon such captain, engineer, pilot, or other person, the life of any person on board such vessel is destroyed. But there must be some improper act inconsistent with the faithful performance of duty, or negligence in the performance of a proper act, or inattention to some duty imposed upon such person, and the death of some person on board a vessel in consequence thereof, before there can be a conviction. There must be not only such improper act, or negligence, or inattention, but there must also be a death of some person on board, as a consequence of such improper act, negligence, or inattention; and, if these are proved, it is unnecessary to inquire whether or not the accused had any wrong intention. But, although such improper acts and negligence, inattention, and death are proved, yet, if such death was not in consequence of such improper acts, or negligence, or inattention, there can be no conviction. To make myself understood, gentlemen, the law of congress makes it necessary, or rather makes it the duty of every captain, at every landing place, to blow off steam. If he does not blow off steam, that is misconduct or negligence, or inattention to his duty. But if, subsequently to that time, a death occurs on board of a boat, and it is not attributable to that cause, although there may have been misconduct, negligence, or inattention, there can be no conviction, for the death is not connected with the act complained of, and which is said to be misconduct or negligence. And if there were death, and such a death were in consequence of some misconduct, negligence, or inattention by some one employed on the vessel, if these defendants are not chargeable with such misconduct, negligence, or inattention, and if there is not proved to your satisfaction that they have been guilty in this respect, there can be no conviction. In other words, if there has been a death, and such death has been occasioned by the misconduct or negligence of some other person other than those, if those persons have not been guilty of negligence or such misconduct or negligence as caused that death, or contributed to it, then they cannot be convicted.

Those who conduct this prosecution do not claim that these defendants, or either of them, intended the death of any one on board the vessel. There is no necessity that they should. They are not accused of any willful design to take the life of any one. The indictment is not pressed upon that ground, but, as I have before intimated, it is pressed on the ground that the lives which have been lost were lost by the misconduct, negligence, or inattention of the defendants. In an action in favour of any passenger on board the Henry Clay, at the time of the disaster, against the owners or captain of the boat, for any injury to his person, or to his property, the mere fact of such injury, caused by the burning of the boat, would be sufficient, if there was nothing else in the case, for the jury to say, and they would be bound to say, that the boat was destroyed by negligence, so as to make the party defendant liable for the damage claimed in consequence of such burning. In such a case, from the fact of burning, negligence and misconduct are presumed, and the defendants would be liable for the negligence, unless they proved affirmatively, that the fire was not caused by negligence or misconduct; for from this fact the law takes it for granted that the defendants are guilty, and, to prevent a verdict against them, they must prove their innocence. This, gentlemen, is the rule in a civil case, where a party brings a suit for the recovery of damages; but this is not the rule in a criminal case, such as you are now about to determine. In a criminal case there is no such presumption against the defendants which they must remove, but all the legal presumptions are in their favour, until the contrary is proved; and the death claimed to be in

consequence of any misconduct or negligence must be proved to be, before a conviction be had, the direct consequence of the mismanagement and negligence complained of, and if it is not the direct consequence of the misconduct or negligence complained of, a conviction cannot be had. As in the case cited by the counsel from the books, where an individual places a loaded gun in the corner of the room and another person not knowing that it was loaded, takes it up and innocently snaps it, by which it is discharged, and causes the death of some one, there would be a death, and there would be negligence on the part of him who placed the loaded gun in the corner of the room. If there had not been that negligence, there would not have been a loss of life, but that negligence would not be the immediate cause of the death. The negligence did not directly produce the death. It could not produce it without the act of some other person, and, as the death was not intended by the person who was guilty of the negligence in so placing the loaded gun, and as the death was not the immediate consequence of such negligence, and would not have taken place but for the act of another person, the party guilty of such negligence would not be responsible for that death. But if the negligence or improper act complained of be the sole cause of the death, if it cause or produce the burning of the vessel, and such burning of the vessel cause the loss of life, then such loss of life is the direct consequence of such negligence or improper conduct, and the party guilty of the same is liable to the punishment imposed by the act of congress, upon which this prosecution is founded.

An error of judgment merely, gentlemen, is, however, not sufficient to fix such misconduct or negligence upon the person against whom such error of judgment is proved. The law of congress did not intend to punish a mere error in judgment. What was meant by misconduct, negligence, and inattention, in the law of congress, upon which this prosecution is founded, is well expressed by the learned judge, in his charge to the jury, in the case of U. S. v. Farnham [Case No. 15,071]. I, in substance, use his language. "By misconduct," he says, "negligence, or inattention in the management of steamboats, is undoubtedly meant the omission or commission of any act which may naturally lead to the consequences made criminal; and it is no matter what may be the degree of misconduct, whether it is slight or serious, if the proof satisfy you that the setting fire to the boat was the necessary or most probable cause of it." Bearing these rules of law in mind, you will turn your attention to the issue of the question which must be determined by you, in order that a correct decision may be had of the issue which has been framed between the government and the parties now on trial.

The first question is, were the lives of any persons on board the Henry Clay destroyed by the disaster which happened to her on a trip from Albany to New York in 1852? It is admitted, and the proof is full, that there were a number of those who were passengers on board the boat perished in consequence of the sad disaster, the details of which have been repeated during the progress of the trial. Some were destroyed by the fire, and some, attempting to escape from this devouring element, perished in the water.

The next question is, were these defendants persons employed on board the boat, having duties to perform connected with her management and navigation? For, whatever negligence or mismanagement there may have been, and however much the death of the persons destroyed may be connected with any negligence or misconduct, which may be claimed to be chargeable to the defendants, or to any one else, these defendants are not responsible for such misconduct or negligence, unless they were persons employed on board the boat, having duties to perform connected with the management and navigation of the boat. It is admitted that John F. Tallman was the captain of the boat. The captain has generally the command of the boat. All on board performing duties are under the authority of the captain, whoever he may be, and they are subject to his orders. It is admitted that James L. Jessup was the captain's clerk, and, among his duty or duties, was the collecting of fare and giving tickets, and of acting as the assistant to the captain, under him. John Germaine was the engineer of the boat. His duty was confined to attending to the engine, regulating and directing it, and having control of the fireman. Edward Hubbard was the pilot of the boat, and his duty was to direct the course of the boat. James Elmendorf was the assistant pilot, and his duty was to assist the pilot, to act under him, and in his absence to take his place. But it is claimed that Mr. Collyer, a part owner of the boat, and on board of her at the time of the disaster, was not a person on board of her having duties to perform connected with her management and navigation, and, if he was not, he cannot, under any circumstances, be liable to this prosecution. It is claimed, on the part of the government, that he was such person, who at the time of the disaster was on board, having such duties to perform, and that he was, for the time being, the captain of the boat. It is unnecessary, by the law upon which this prosecution is founded, to make a person come within its meaning, that he should be employed under pay to perform any particular duty; but, if any person acts as captain for the voyage, or for any particular time is engaged or acting as captain, or for any cause takes the place of the captain, and for the time being acts as such, he is, within the meaning of the law, the captain of the boat, upon whom is imposed the duties of captain.

The question, then, is, did Mr. Collyer, on the trip from Albany, on the 28th of July, 1852, act for the time being as captain of the boat? Did he take the place of the regular captain? If he did, he was employed, within the meaning of the law. as captain on board the boat. Proof that certain things were done upon his advice. or upon his suggestion merely, would not be sufficient to establish the fact that he was for the time being acting as captain. Nor is it sufficient that he should have passed an opinion, whether asked or unasked. as to the safety or risk of a particular movement of the boat, or of the danger of the mode by which the boat was managed. He must, at least, assume to exercise the control and the authority of the captain to take the command, and no opinion which he may pass, or suggestion that he may make, unless he has a duty to perform on board the boat, will make him an officer, or a person on board of the boat having duties to perform, within the meaning of this act of congress. The government say that they have proved. upon the trip in question, that Collyer was captain of the boat, and they rely upon certain witnesses whom they have called. The principal witnesses are Minturn, Gilson, Gourley, Connor, Hubbard, and a witness from Philadelphia, whose name I do not remember. Most of these witnesses do not speak of any order which Collyer gave. Mr. Minturn speaks of an opinion which he (Collyer) gave as to the danger of the boat; and others speak of suggest'ons which he may have made as to the bell. and others speak of his being on board the boat. displaying great activity. This, gentlemen, will not amount to much to prove that he was captain; and. according to my recollection, there was only one witness. and that was, I think, the witness from Philadelphia—I may be mistaken, and. if I am. bear it in mind. (addressing the counsel)—who says (turning to the jury) that Mr. Collyer on that occasion admitted himself to be captain, and it is claimed on the part of the defence. that this individual is not to be credited. But if, without particularly pointing out the testimony which is relied on upon the one side or the other, you should be of opinion that he was, for the time being, captain of the boat, having control of the same, and having command of the same, he would, if the boat was destroyed by negligence, and those lives were lost, be responsible under this act of congress.

The next question, and the great question in this case, is, was there misconduct. or negligence, or inattention to duty, on the part of those who had the management of the boat? Were the officers justly chargeable with misconduct, negligence, or inattention to their duties as such officers, by which the disaster took place, and in consequence of which the numerous lives were lost, which were destroyed on that occasion? To justify a conviction, a neglect of the duty imposed upon the defendants and which it is in-

cumbent upon them to perform, or some misconduct in the performance of that duty, must be proved. by which. as a consequence, this disaster took place. It must be proved that they have done that which they ought not to have done, or done improperly, and in a negligent manner. that which they ought to have done in a proper and careful manner, or that they neglected to do that which they ought to have done, by which the disaster occurred, and which disaster would not have occurred if it. had not been for such misconduct or negligence of duty. And if the fire occurred by the neglect of a particular person on board the boat, in the performance of his particular duties, and not by the neglect of duty or misconduct of others, he only by whose misconduct or neglect of duties the disaster occurred is responsible for the consequences. The government claim that there was negligence of duty and misconduct upon the part of each of the defendants, by which the disaster took place, and, as a consequence, the loss of life that took place. They claim this misconduct and negligence in two particulars: First, in so conducting, and in so neglecting to conduct. before the fire, that the fire on board the Henry Clay took place as a consequence thereof. They claim, in the second place, that there was negligence and misconduct in these defendants, in their conducting after the fire took place, in running the boat on shore, and in neglecting to attend to the safety of the passengers after boat was turned to the shore, and after she had already reached the shore, and also by the order that was given to go aft, and that by such latter misconduct and negligence the loss of life took place.

By the testimony of Mr. Belknap, a most intelligent witness,—as intelligent as any witness that I have ever seen upon the stand in a court,—it appears. that the Henry Clay was one of the best boats recently built in the city of New York. By his testimony, it appears that her hull was built in the most substantial manner; that she was so constructed that there was as little danger from fire as there would be on any boat navigating the North river; that she had one of the best engines and boilers, and, as, admitted by the government counsel. she was officered by men whose character and whose skill stood fair in the community and deservedly high. She had a skillful and prudent captain, it is admitted; she had a skillful and competent engineer; an experienced and competent pilot and assistant pilot. She was well officered and manned, as it appears, by four firemen, and there is no claim but that that number was her full complement. On her trip from Albany she took fire, as has been stated. near a place thirteen or fourteen miles from the city of New York, and the question, gentlemen, is whether that fire was caused by the negligence of these individuals now on trial, or the negligence of any of them. If it was caused by the negligence of

one, and him only, he alone is responsible. If it was caused by the negligence of the whole of them, they all are responsible. If it was caused in a manner that is not accounted for, unless it is proved to your satisfaction that it was caused by the misconduct or negligence of these defendants, then it would become your duty to acquit. What is the theory on the part of the government? The theory is that from Hudson, on that day, the vessel was put under an excessive rate of speed,—in other words, that she was engaged in a race with the Armenia,—and, to produce that excessive rate of speed, an excessive quantity of fuel was applied to the furnaces; and that in consequence of that excessive quantity of fuel thus applied, and the manner that it was applied, by the negligence of these defendants, as a consequence of that, this boat took fire. Now, gentlemen, when they arrived at Kingston, it is evident that there was a great alarm on board this boat in consequence of that collision. But can you trace that collision as a cause for the burning of the boat eighty-three miles below? If you can not say that anything that took place was the cause of the burning of the boat eighty-three miles below, then, although you should be of the opinion that there was misconduct or negligence, these defendants would not be responsible, unless you can say that the burning of the boat was in consequence thereof.

But the government go further, and if their theory is right, then it would undoubtedly follow that the burning was attributable to the causes assigned by them. The government claims, gentlemen, that at Hudson the racing commenced; that this intense fire was then applied; that it was kept up down to Kingston; and that, after the boat left Kingston, it was continued, in order to keep up the race; and that it was so continued up to the time it was discovered that the boat was on fire, and then it had arrived at such a heat that the fire was communicated from the furnaces in some way to the boat, by the misconduct or negligence of these men. They claim there was a race. If there was no race, then the theory of the government fails, and the question for you to determine is, was there a race at the time that the fire was discovered, or for any considerable portion of the time previous thereto? If there was a race six or eight hours before, and if you cannot connect the fire with that race six or eight hours before, then you cannot say that these defendants are guilty under this act of congress. It is not claimed, on the part of the government, that there was any combination beforehand to have this race. Indeed, it is affirmed that the understanding between the boats was, at the time they went up, that the Clay should take the lead, and that the Armenia should follow, and that no one had any idea of race. If this is the true theory, I do not see what reliance can be placed upon the testimony of one witness examined here,—I mean the fireman who left the boat. He purposes showing that it was intended to be a race in coming from Albany to New York, and he testified that Capt. Tallman, as he went up from New York to Albany, said, when the Armenia came out of the dock, that "he would beat her going up and coming down." There must be some mistake on this subject. If there was an understanding that there should be no race in going up at that time, and no race in coming down, and if the theory of the government is that the race selected is from Hudson, what that witness said as to the fear he had in going up, and as to what he said to Mr. Tallman when the boat was leaving the dock at Albany, would have little weight; because, from the theory of the government, at that time the race was not contemplated.

Was this race continued, and the fire kept up, so that it was in an improper manner communicated to the boat? We are not able to ascertain exactly how much steam was carried on this occasion down to New York. One witness said he thought he saw forty pounds marked up, one said it was seventeen or twenty pounds; and, to my mind, it was not very satisfactorily accounted for what it was. If Mr. Belknap, the builder of this boiler, is correct in his statement that the vessel could not carry more than thirty-one pounds of steam without the steam blowing off, then it follows she could not have had more than that, unless the government make out that the safety-valve was tied down, so that the steam would not blow off. What is the proof upon the subject that the Clay carried an excess of steam? The fact is well established, as I understand it, that her ordinary time of arrival was at three o'clock, or soon after. This accident happened thirteen, fourteen, or fifteen miles above there, a little after three o'clock. Then, if three o'clock was the ordinary time of her arrival in New York, at her ordinary speed, there could not have been very extraordinary speed in driving her down as far as Yonkers at the time she ordinarily arrived in New York. What is the evidence upon the subject of this negligence? for there may be negligence, even without an extraordinary rate of speed. The fire was discovered in a certain part of the boat that has been pointed out. She had a short time before been inspected. In June previous, the hull inspector declared her to be complete, so far as the hull was concerned,—a complete and safe boat for the navigation of the Hudson. The inspector also declared her boilers complete and sufficient for the thirty pounds of steam which Mr. Curtis says he allowed her to take. She was then declared by these men as a competent boat. How did this fire originate? You have only the testimony of one of the firemen, but the other is all surmise. He tells you how it was. You may believe other witnesses rather than the fireman, but you have got to establish the fact that it was in consequence of the misconduct of these defendants, before you can convict them. It

was discovered at a particular point. Efforts were made to put it out, but these efforts were unavailing, and the result was such as has been testified to. I will not occupy more time on the subject whether the negligence was proved or not; it is emphatically a question for your determination. If there was no negligence or misconduct, then, of course, these defendants cannot be guilty of misconduct or negligence. If there was negligence or misconduct by others, and in consequence of that the fire was communicated to the boat, these defendants would not be responsible for that negligence. For instance, to make myself understood, here is a pilot whose duty is to direct the course of the boat. He is a faithful man. He is intrusted with the boat, to direct her in her course; but for some reason or other, he willfully drives her upon a rock, and lives are lost. That would be misconduct in him, but it would not be misconduct in the captain, for the captain has done all that a prudent man could do to employ a competent pilot, with a good reputation. So it is in case of a fireman. If a captain has employed competent and faithful firemen, and if they, by their negligence, cause a fire, then, in my judgment, the other officers would not be responsible for it, because the captain has done everything a prudent man can do. He has appointed faithful and reliable men, and, if those men abuse their trust without any fault on his part, the captain, in my judgment, would not 1 s liable under this law. He and every one is responsible for his own negligence. But in the case I put of a pilot who was employed as a faithful man, if he abuses the trust confined in him, the captain would not be liable for that abuse, but the pilot himself alone.

Was there any further negligence in running this boat ashore, and in so conducting matters after the boat had struck the shore, that the lives of these passengers were lost? The proof is abundant that this boat was run ashore in the best possible manner. All the witnesses agree upon that subject. All the nautical men.—landsmen would not understand it as well.—all the nautical men brought on the part of the government, say that the vessel was run on shore in the best possible manner. Were these defendants then guilty of negligence or misconduct after the Clay got on shore? There was an order given to go aft, and it has been explained to you by the defendants why such was a reasonable order. She struck the shore, and it seems that those who had presence of mind about them, who were aft at the time she struck the shore, escaped; and I was never more struck in my life with the necessity of presence of mind than I was when some of these witnesses were testifying, particularly Dr. Wells, who says he was aft in obedience to the order, and that he remained aft until she struck the shore, and the females whom he had under his charge had passed forward, and escaped to the bow, and he then passed on. Mr. De Peyster did

the same, and probably others. But others were panic-stricken, and most people are so on an occasion when they are every moment in danger of perishing either by the water or flames.

Then, gentlemen, it appears that these defendants, when the vessel struck the shore, were in the water, endeavouring to save lives. Were these officers guilty of any misconduct or negligence in not saving more lives? Upon this subject, I will say, as I said in opening my charge, that an error of judgment merely would not make then culpable. The evidence is abundant that they exerted themselves to save those who were in the water. What men generally would have done, under such circumstances, we do not know. Whether they directed their attention to save this class or that class, we are not certain. If you think that in what they did there existed an error of judgment, then, gentlemen, you cannot convict them. If, however, they were guilty of misconduct or negligence, or inattention to their duties, such as I have described it to you to be, then, gentlemen, you will be authorized to convict.

With these remarks you will take the case under your consideration, and return such verdict as you, in your proper judgment, may think proper.

One thing I have omitted to notice: It is admitted, on the part of the prosecution, that these defendants were perfectly skillful in their several professions, and their private character was good. This circumstance, although it will not overcome evidence when it is positive, yet, in balancing the case, it will go a great way to turn the balance in favour of the accused. The case rests with you, gentlemen.

The learned judge concluded his charge at ten minutes past three o'clock, after which the jury retired to consult. At twenty-eight minutes to four the jury returned, when their names were called over by the clerk of the court:

The Clerk. Have you agreed upon your verdict, gentlemen?

The Foreman. Yes.

The Clerk. How do you find?

The Foreman. Not guilty.